# EXHIBIT G



# Finger Lakes Capital Partners

400 W. 22ND STREET, SUITE 2R  •NEW YORK, NY 10011  •(212) 502-1102  •FAX: (201) 221-8224  •WWW.FLCPARTNERS.COM

July 10', 2014

Dr. Jagat S. Mehta, MD
12 Chelsea Park
Pittsford, NY 14534

Dear Dr. Mehta

Dr. Jagat Mehta ("JM") has provided Loans to Finger Lakes Capital Partners LLC ("FLCP") of $300,000.00 as of 9/28/06, $99,898.05 as of 12/31/06, $125,000.00 as of 10/26/07, and $25,000.00 as of 12/03/07, resulting in total Loans of $549,898.05. The principal amount of the Loans is due and payable from FLCP to JM together with interest on the principal amount of the Loans from time to time outstanding, at the annual rate of 6% simple on demand.

This letter Agreement modifies, amends and entirely restates all previous agreements relating to the subject matter hereof.

Very Truly Yours,

Finger Lakes Capital Patners LLC

By: _____
GREGORY SHALOV, a member

By: _____
ZUBIN MEHTA, a member

AGREED TO:    _____
JAGAT S. MEHTA

–2–                                                                    July 10, 2014

The undersigned jointly and severally, guarantee, as principal and not as surety, the payment and performance when due, all obligations of FLCP under the foregoing Letter Agreement

_____
GREGORY SHALOV, in his personal capacity


_____
ZUBIN MEHTA, in his personal capacity

# EXHIBIT H

SECURITY AGREEMENT

SECURITY AGREEMENT dated as of May 22, 2015, between . Jagat S. Mehta (the "Creditor"), and Finger Lakes Capital Partners LLC (the "Obligor").

WHEREAS, the Creditor has loaned, and may in the future loan, certain funds to the Obligor pursuant to that certain Letter Agreement dated July 10, 2014 (the "Secured Promissory Note"), between the Obligor and the Creditor;

WHEREAS, the Creditor has arranged for certain other extensions of credit for the benefit of the Obligor which are to constitute Secured Obligations (as defined below) hereunder; and

WHEREAS, it is a condition to the extension and continuance of the extensions of credit to the Obligor pursuant to the Secured Promissory Note that the Obligor grant a security interest in favor of the Creditor in substantially all of its assets, as described herein;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. GENERAL DEFINITIONS.

    1.1    As used herein, "UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Creditor's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

    1.2    All capitalized terms contained in this Agreement, but not specifically defined in this Agreement, shall have the meanings provided by the UCC to the extent the same are used or defined therein. Without limitation, the following terms are used herein as defined in the UCC: Account, Chattel Paper, Deposit Accounts, Documents, Equipment, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter-of-Credit Rights, Payment Intangibles, Proceeds, and Supporting Obligations.

    1.3    As used herein:

    (a)    "Person" means any individual, corporation, partnership, limited liability company, trust, unincorporated organization, or any other entity or organization.

    (b)    "Other Obligor" means any other person obligated as direct or indirect obligor or guarantor of any Obligations, or of any indebtedness, obligations and liabilities guaranteed by the Obligor.

    (c)    "Receivable" means any right to payment, including any Account, whether or not evidenced by an Instrument or Chattel Paper and whether or not it has been earned by performance.

2. OBLIGATIONS SECURED. The Collateral (as defined below) shall secure any and all indebtedness, obligations and liabilities of the Obligor to the Creditor, including:

    (a)    all unpaid principal of and interest on, and all other obligations or liabilities of the Obligor which may arise under or in connection with the Secured Promissory Note and all other loans, advances and other financial accommodations made, issued or extended by the Creditor to or on behalf of the Obligor,

1

(b) all interest, fees, costs, expenses, reimbursement obligations, indemnities and other liabilities relating to any of the foregoing, including attorneys' fees and costs or expenses incurred in connection with collection and enforcement and sums advanced by the Creditor to protect the Collateral or otherwise as permitted to be made by the Creditor under this Agreement; and

(c) all indebtedness, obligations and liabilities under this Agreement;

in each case, whether now existing or hereafter arising, joint or several, absolute or contingent, liquidated or unliquidated, and however arising (all such indebtedness, obligations and liabilities being collectively referred to herein as the "Obligations"; and any agreement, instrument, guaranty or other document now or hereafter evidencing or securing any of the Obligations, being collectively referred to herein as the "Financing Documents").

3. GRANT OF SECURITY INTEREST. To secure the punctual payment and performance of the Obligations when due whether at the stated maturity, by acceleration or otherwise), the Obligor hereby grants to the Creditor a security interest in and to, and a lien upon (the "Security Interest"), all right, title and interest of the Obligor in and to the following property, whether now owned and existing or hereafter acquired or arising, and wherever located (collectively, the "Collateral"):

(a) All Accounts and other rights to the payment of money, whether due or to become due, and whether or not earned by performance;

(b) All Chattel Paper, including electronic chattel paper;

(c) All Instruments, including promissory notes, whether due or to become due, and whether or not earned by performance;

(d) All General Intangibles, including all contracts, purchase orders or other supplements thereto, rights to moneys, choses in action, goodwill, tax refunds, Software, intellectual property, patents, copyrights, tradenames and trademarks;

(e) All Goods;

(f) All Inventory, including all Goods held for sale or lease or to be furnished under contract of service or so leased or furnished, and all parts, raw materials, work in process, and supplies relating thereto;

(g) All Equipment;

(h) All Documents, including all negotiable and nonnegotiable Documents covering any Inventory, Equipment or other Collateral;

(i) All rights under insurance contracts covering any Inventory, Equipment, Documents or other Collateral;

(j) All Investment Property, including all certificated and uncertificated securities and including all membership interests in limited liability companies;

(k) All Deposit Accounts;

(l) All Letter-of-Credit Rights;

(m) All Payment Intangibles;

(n) All Supporting Obligations;

2

(o) All other property of the Obligor now or hereafter in the possession, custody or control of the Creditor;

(p) All Records, including all books and records pertaining to any of the foregoing, including any computer-readable memory and any computer hardware or software necessary to process such memory; and

(q) All Proceeds of any of the foregoing in whatever form, whether derived from voluntary or involuntary disposition, all products of any of the foregoing, all renewals, replacements, substitutions, additions, accessions, rents, issues, royalties and profits of, to or from any of the foregoing and all dividends, distributions or other income from Investment Property, collections thereon or distributions or payments with respect thereto.

The Security Interest created herein is subject to any applicable restriction to the creation of a Security Interest to the extent that such restriction is not made ineffective by UCC Sections 9-406, 9-407, 9-408, or 9-409.

4. REPRESENTATIONS AND WARRANTIES. The Obligor represents and warrants to the Creditor that:

4.1 Authority. The Obligor has full power and authority to grant security interests in the Collateral and to execute, deliver, and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other person except as may have been specifically disclosed to the Creditor in writing.

4.2 Absence of Other Encumbrances. The Collateral is free and clear of all liens and adverse claims other than the Security Interest, except for (i) purchase money security interests on Inventory or Equipment not financed by the Creditor, (ii) liens imposed by law such as materialmen's, suppliers', mechanics', carriers', repairmen's or other like liens imposed in the ordinary course of business, (iii) liens for taxes, assessments or governmental charges not yet due or delinquent, and (iv) unperfected lien, if any lien at all, of Jeffrey Keswin.

4.3 Information Regarding Name and Jurisdiction of Organization. The Obligor's exact legal name is as set forth on the signature page thereto. The Obligor is a a limited liability company organized under the laws of the state of Delaware..

5. COVENANTS AND AGREEMENTS OF THE OBLIGOR. The Obligor covenants and agrees as follows:

5.1 Restriction on Further Encumbrances. The Obligor shall not, without the prior written consent of the Creditor, create, grant or suffer to exist any other liens in or to any of the Collateral except for liens described in Section 4.2 above.

5.2 Records and Inspection. The Obligor shall keep and cause to be kept accurate and complete records of the Collateral and its proceeds at its principal place of business, which Collateral and records will be made available for inspection and copying upon such premises by the Creditor at any reasonable time.

5.3 Restriction on Changing State of Organization. The Obligor shall not change the state of its incorporation or its jurisdiction of organization (as applicable) or convert into a different type of entity.

5.4 Information Regarding Names. At least 30 days before changing its name or adopting a new name, the Obligor shall give written notice to the Creditor of any new name or trade name of the Obligor.

5.5 Information on Collateral and Business. The Obligor shall deliver to the Creditor such other data and information (financial and otherwise) as the Creditor from time to time may reasonably request bearing upon or related to the Collateral or the Obligor's business operations or financial condition.

5.6 Duty of Care. The Obligor shall be responsible for preserving and maintaining the Collateral and the Creditor shall have no duty of care with respect to the Collateral, except that the Creditor shall

3

have an obligation to exercise reasonable care with respect to Collateral in its possession; provided that (i) the Creditor shall be deemed to have exercised reasonable care if Collateral in its possession is accorded treatment substantially comparable to that which the Creditor accords its own property or treatment substantially in accordance with actions requested by the Obligor in writing, although the Creditor shall not be obligated to comply with any such requests and (ii) the Creditor shall not be obligated to take steps to preserve rights against any other parties or property.

       5.8       Taxes. The Obligor shall pay when due all governmental taxes, assessments or charges upon the Collateral.

       5.9       Further Assurances and Authority of Creditor. The Obligor shall from time to time execute, deliver, file and record all such further agreements, instruments, financing statements, notices and other documents (collectively, "Supplemental Documentation") as may be requested by the Creditor to perfect or preserve the Security Interest, to enable the Creditor to notify any third parties of the existence of the Creditor's Security Interest, or otherwise to carry out the intent of this Agreement. The Obligor authorizes the Creditor to file financing statements where desirable in the Creditor's judgment to perfect the Security Interest without the signature of the Obligor, including the filing of a financing statement describing the Collateral as "all assets" or using words of similar import. If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Certificated Security or Chattel Paper, such Instrument, Certificated Security or Chattel Paper shall be immediately delivered to the Creditor, duly indorsed in a manner satisfactory to the Creditor, to be held as Collateral pursuant to this Agreement.

       5.9       Power of Attorney. The Obligor hereby irrevocably makes, constitutes and appoints the Creditor (and all persons designated by the Creditor for that purpose) as the Obligor's true and lawful attorney (and agent-in-fact) to (i) sign the name of the Obligor on any Supplemental Documentation and to deliver any Supplemental Documentation to such persons as the Creditor, in its sole discretion, may elect and (ii) to obtain, hold, direct or redirect delivery of or otherwise administer, and control any agreement, instrument or document evidencing any portion of the Collateral or the Obligor's rights with respect thereto, including documents of title, warehouse receipts and security agreements (collectively "Special Collateral"), as the Creditor, in its sole discretion, may elect.

       5.10      Insurance. The Obligor shall, at its sole expense, maintain the Collateral insured against such risks and in such amounts, subject to such deductibles, and for such periods as is customarily carried by other owners or users of such properties comparable to the Obligor in similar businesses. [Within 30 days after the date of this Agreement, such policies shall be endorsed to provide that: (i) the insurance carrier shall give at least 30 days prior notice to the Creditor before any such policy shall be altered or canceled, (ii) no act or default of the Obligor shall affect the right of the Creditor to recover under such policy in case of loss or damage, and (iii) from and after the date, if any, on which the insurance carrier receives notice from the Creditor that an "Event of Default" has occurred under this Agreement, all proceeds payable under such policy shall be payable directly to the Creditor (subject to the rights of any other secured Creditor disclosed to the Creditor before the date hereof).] Any amounts received under such policies may be applied by the Creditor to the Obligations in such order and at such times as the Creditor may determine or, at the option of the Creditor, released to the Obligor, provided that no such application or release shall cure or waive any Event of Default and no amount released shall be deemed a payment of any obligations. In the event the Obligor at any time fails to maintain any of the policies of insurance required above or equivalent replacement policies or fails to pay any premium in whole or in part, then the Creditor, without waiving or releasing any of the Obligations or any Event of Default, may (but shall be under no obligation to) obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto that the Creditor deems advisable.

       6.       REMEDIAL PROVISIONS.

       6.1       Right to Satisfy Other Claims and Taxes. If the Obligor fails to pay any governmental taxes, assessments or other charges when due, or fails to pay any claims secured by any lien against any Collateral when due, the Obligor shall so advise the Creditor in writing and the Creditor may, without waiving or releasing any obligations of the Obligor or any Event of Default, in its sole discretion (and without any obligation to do so), make

such payment or any part thereof or obtain such discharge and take any other action with respect thereto that the Creditor deems advisable.

        6.2     Certain Matters Relating to Receivables. At the Creditor's request, the Obligor shall deliver to the Creditor all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Receivables, including, without limitation, all original orders, invoices and shipping receipts. The Creditor in its own name or in the name of others may at any time communicate with obligors under the Receivables to verify with them to the Creditor's satisfaction the existence, amount and terms of any Receivables, provided that the Creditor will not make communications in its own name unless an Event of Default has occurred and is continuing. Anything herein to the contrary notwithstanding, the Obligor shall remain liable under each of the Receivables to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto. The Creditor shall not have any obligation or liability under any Receivable (or any agreement giving rise thereto), by reason of or arising out of this Agreement or the receipt by the Creditor of any payment relating thereto, nor shall the Creditor be obligated in any manner to perform any of the obligations of the Obligor under or pursuant to any Receivable (or any agreement giving rise thereto) to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

        7.     RELEASE OF COLLATERAL. Except for (i) sales or other dispositions of Inventory made prior to the occurrence of an Event of Default that are in the ordinary course of the Obligor's business and not prohibited by any provision contained in the Financing Documents and (ii) sales or other dispositions of Collateral for which the Obligor obtains the prior written consent of the Creditor (collectively, "Permitted Sales"), the Obligor shall not sell, lease, license or otherwise dispose of the Collateral, or any part thereof or any interest therein. Concurrently with any Permitted Sale, the Security Interest shall automatically be released from the property so disposed of; provided, however, that the Security Interest shall continue in the proceeds thereof.

        8.     EVENTS OF DEFAULT. Each of the following shall constitute an Event of Default by the Obligor:

        (a)     The failure of the Obligor to pay any Obligation of the Obligor to the Creditor when due;

        (b)     The failure of any Other Obligor to pay any obligation, liability or indebtedness of such Other Obligor to the Creditor when due;

        (c)     Any other failure to observe or perform any of the covenants or obligations imposed upon the Obligor or any Other Obligor by any of the Financing Documents, which failure is unremedied for more than 10 days after receipt of notice thereof from the Creditor;

        (d)     The occurrence or existence of any other default or Event of Default under any Financing Document;

        (e)     Any representation or warranty contained in any Financing Document or any financial statements, certificates, schedules or other information now or hereafter furnished by the Obligor or any Other Obligor proves false or misleading in any material respect;

        (f)     The termination of existence or cessation of business by the Obligor or any Other Obligor;

        (g)     The making of an assignment for the benefit of creditors by the Obligor or any Other Obligor;

        (h)     The commencement of any case or proceeding by or against the Obligor or any Other Obligor under Title 11 of the United States Code (Bankruptcy) or of any other proceeding, suit or action (at law, in

5

equity, in Bankruptcy or otherwise) for adjudication as a bankrupt, reorganization, composition, extension, arrangement, receivership, liquidation or dissolution by, of, or against the Obligor or any Other Obligor;

(i)     The appointment of a receiver, trustee, custodian or similar officer for or over the Obligor or any Other Obligor or any of its property, which is not vacated within 10 days thereafter;

(j)     The levy of any writ of execution or other judicial process upon any of the property of the Obligor or any Other Obligor which is not released within 10 days thereafter;

(k)     The uninsured damage to or material decline in the market value of the Collateral unless immediately replaced or supplemented by the Obligor;

(l)     The failure by the Obligor or any Other Obligor to make any payment when due (subject to any applicable grace period), whether by acceleration or otherwise, of any other indebtedness for borrowed money of, or guaranteed by, the Obligor or any Other Obligor, or default by the Obligor or any Other Obligor in the performance or observance of any obligation or condition with respect to any such other indebtedness if the effect of such default is to accelerate the maturity of any such indebtedness or to permit the holder or holders thereof, or any trustee or agent for such holders, to cause such indebtedness to become due and payable prior to its expressed maturity.

9.     RIGHTS AND REMEDIES OF THE CREDITOR UPON EVENT OF DEFAULT.

9.1     Effect of Event of Default Remedies. If any Event of Default described in Sections 8(g), 8(h) or 8(i) above shall occur, all Obligations secured this Agreement shall become immediately due and payable, all without notice of any kind; and, in the case of any other Event of Default, the Creditor may declare the Obligations secured by this Agreement to be due and payable, whereupon such Obligations shall become immediately due and payable, all without notice of any kind. The Creditor shall promptly advise the Obligor of any such declaration, but failure to do so shall not impair the effect of such declaration. In addition, upon the occurrence of an Event of Default, the Creditor may exercise the rights, powers and remedies set forth below.

(a)     In addition to all of its other rights, powers and remedies under this Agreement, the other Financing Documents, and other applicable law, the Creditor shall have all of the rights, powers and remedies of a secured party under the Uniform Commercial Code of the state in which such rights, powers and remedies are asserted.

(b)     The Creditor shall have the right: (i) to enter upon the premises of the Obligor or any other place or places where Collateral is located through self-help and without judicial process or giving the Obligor notice; (ii) to prepare, assemble, or process Collateral for sale, lease, or other disposition; (iii) to remove Collateral to the premises of the Creditor or any agent of the Creditor, for such time as the Creditor may desire, in order to collect or dispose of Collateral; and (iv) to require the Obligor to assemble Collateral and make it available to the Creditor at a place to be designated by the Creditor.

(c)     Until the Creditor is able to effect a sale, lease, or other disposition of Collateral or any part thereof, the Creditor shall have the right to use, process or operate Collateral or any part thereof to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by the Creditor.

(d)     The Creditor shall have the right to sell, lease, license, or otherwise dispose of all or any Collateral in its then existing condition, or after any further assembly, manufacturing, or processing thereof, at public or private sale or sales, in lots or in bulk, for cash or on credit, all as the Creditor, in its sole discretion, may deem advisable. Without limitation, the Creditor may specifically disclaim any warranties of title and the like. The Creditor shall not be obligated to clean up or otherwise prepare the Collateral for sale. Such sales may be adjourned and continued from time to time with or without notice. The Creditor shall have the right to conduct such sales on the Obligor's premises or elsewhere and shall have the right to use the Obligor's premises without charge for such sales (or preparation for sales) for such time or times as the Creditor deems necessary or

6

advisable. The Creditor is hereby granted a license or other right to use, without charge, the Obligor's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, and advertising matter, or any property of a similar nature as it pertains to Collateral, in advertising for sale or lease or the disposition of any Collateral. The Creditor may purchase all or any part of the Collateral at public or, if permitted by law, private sale, and in lieu of actual payment of such purchase price may set off the amount of such Obligations whether or not such Obligations are matured. The Obligor agrees that any sale of Collateral conducted by the Creditor in accordance with the foregoing provisions of this Section shall be deemed to be a commercially reasonable sale under the UCC. The Creditor may comply with any applicable laws and regulations in connection with any exercise of remedies hereunder and such compliance shall not be considered to adversely affect the commercial reasonableness of such exercise of remedies.

        9.2        <u>Application of Proceeds</u>. Any proceeds received by the Creditor in respect of any sale of collection from, or other realization upon all or any part of the Collateral following the occurrence of an Event of Default may, in the discretion of the Creditor, be held by the Creditor as collateral for, and/or then or at any time thereafter applied by the Creditor as follows: (i) first, to pay all costs, expenses and charges of every kind (including attorneys' fees and costs) for pursuing, searching, protecting, taking, removing, storing, safekeeping, caring, preparing for sale, advertising, selling and delivering the Collateral and otherwise enforcing this Agreement and the other Financing Documents; (ii) second, to pay the Obligations in order determined by the Creditor in its sole discretion; and (iii) third, to pay the remaining funds, if any, after payment of all the Obligations in full, to the Obligor or to whomever may be lawfully entitled to receive such surplus. Payments received from any third party on account of disposition of Collateral shall not reduce the Obligations until paid in cash to the Creditor. The application of proceeds by the Creditor shall be without prejudice to the Creditor's rights as against the Obligor or other persons with respect to any Obligations which may remain unpaid. Any such deficiency shall be paid forthwith to the Creditor by the Obligor.

        9.3        <u>Notice</u>. Any notice required to be given by the Creditor of a sale, lease, or other disposition of Collateral, or any other intended action by the Creditor, which is sent pursuant to Section 15 hereof at least ten (10) days prior to such proposed action, or such longer period as shall be specified by applicable law, shall constitute commercially reasonable and fair notice thereof to the Obligor.

        9.4        <u>Appointment of Creditor as Lawful Attorney; Other Rights Upon Event of Default</u>. The Obligor hereby irrevocably makes, constitutes and appoints the Creditor and all persons designated by the Creditor true and lawful attorney (and agent-in-fact) upon and after the occurrence of an Event of Default for the purposes set forth in the following sentences of this Section. Upon and after the occurrence of an Event of Default, the Creditor or its agent may, without notice to the Obligor and at such time or times thereafter as the Creditor or said agent in its sole discretion may determine, in the Obligor's or the Creditor's name: (i) give notice to account debtors and other obligors and demand payment of Accounts or other obligations included in the Collateral; (ii) enforce payment and exercise all of the Obligor's rights and remedies with respect to the collection of Accounts, any Special Collateral and any other obligations by legal proceedings or otherwise; (iii) settle, adjust, compromise, discharge, release, extend or renew Accounts and other obligations; (iv) prepare, file and sign the Obligor's name on any proof of claim or similar document in any insolvency or similar case against any Account debtor or any person indebted to the Obligor; (v) endorse or sign the name of the Obligor upon any checks, drafts, chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to Accounts, Inventory, or Special Collateral; (vi) use the Obligor's stationery and sign the name of the Obligor to verifications of Accounts and other obligations to Account debtors and other obligor; (vii) use the information recorded on or contained in any data processing equipment and computer hardware and software to which the Obligor has access relating to Accounts, Inventory, or Special Collateral; (viii) open any lock box; (ix) transfer into the name of the Creditor or the name of the Creditor's agent or nominee any of the Collateral; (x) make, settle and adjust claims under policies of insurance, endorse or sign the name of the Obligor on any check or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect thereto and (xiii) receive and direct the disposition of any proceeds of any Collateral.

        10.        <u>CREDITOR'S EXPENSES, INCLUDING ATTORNEYS' FEES</u>. Regardless of the occurrence or existence of an Event of Default, the Obligor shall pay to the Creditor, on demand, the amount of any costs or expenses (including attorneys' fees and expenses) paid or incurred at any time or times in connection with: (i) any attempts to defend, protect or enforce the Security Interest or the priority thereof, including the discharging of any

7

prior or subsequent lien or adverse claim against any Collateral thereof which is not permitted hereunder; (ii) any attempt to collect the Obligations or enforce any rights of the Creditor, whether under this Agreement or other Financing Documents, or otherwise, against the Obligor or any other person under the Financing Documents; (iii) any litigation, dispute or proceeding (whether instituted by the Creditor or any other person) in any way relating to Collateral, this Agreement, the other Financing Documents or the Obligor's affairs; or (iv) any amounts expended by the Creditor under Section 5.5 or Section 6; or (v) the inspection, verification, protection, collection, sale, liquidation or other disposition of Collateral. Additionally, if any taxes or charges shall be payable on account of the execution or delivery of this Agreement, any other Financing Documents or the creation of any of the Obligations by reason of any existing or hereafter enacted federal, state or other regulation or statute (including any foreign country's regulations or statutes), the Obligor will pay all such taxes and charges, including any interest and/or penalty thereon, and will indemnify and hold the Creditor harmless from and against liability in connection therewith. All obligations under this Section 10 shall constitute additional Obligations secured by the Collateral and shall bear interest at the same rate as provided for the largest amount of other Obligations.

11. ASSIGNMENT BY THE CREDITOR. The Obligor agrees that the Creditor may assign or otherwise transfer this Agreement, or any of other Financing Documents, and may deliver all or any of the Collateral to the transferee(s), who shall thereupon become vested with all the powers and rights in respect thereto given to the Creditor herein or in the Financing Documents transferred, and the Creditor shall thereafter be fully discharged from any liability or responsibility with respect thereto, all without prejudice to the retention by the Creditor of all rights and powers hereby given with respect to any Financing Documents, instruments, rights or property not so transferred.

12. REMEDIES NOT EXCLUSIVE: FORECLOSURES. No right or remedy hereunder is exclusive of any other right or remedy. Each and every right and remedy shall be cumulative and shall be in addition to and without prejudice to every other remedy given hereunder, under any other agreement between the Obligor and the Creditor or now or hereafter existing at law or in equity, and may be exercised from time to time as often as deemed expedient, separately or concurrently. The giving, taking or enforcement of or execution against any other or additional security, collateral, or guaranty for the payment of the Obligations shall not operate to prejudice, waive or affect any rights, powers or remedies hereunder, nor shall the Creditor be required to first look to, enforce, exhaust or execute against such other or additional security, or guarantees prior to so acting against the Collateral. The Creditor may foreclose on or execute against the items of Collateral in such order as the Creditor may, in its sole and unfettered discretion, determine.

13. WAIVERS. The failure or delay of the Creditor to insist in any instances upon the performance of any of the terms, covenants or conditions of this Agreement or other Financing Documents, or to exercise any right, remedy or privilege herein or therein conferred, shall not impair or be construed as thereafter waiving any such covenants, remedies, conditions or provisions, but every such term, condition and covenant shall continue and remain in full force and effect; nor shall any waiver of an Event of Default suspend, waive or affect any other Event of Default, whether the same is prior or subsequent thereto and whether of the same or of a different type.

14. SEVERABILITY. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective. If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

15. TERMINATION. Upon payment in full and performance of all Obligations owed by the Obligor to the Creditor pursuant to the Financing Documents (including payment in full and performance of all indebtedness, obligations and liabilities of other persons guaranteed by the Obligor) and the termination of all obligations of the Creditor to extend credit under the Financing Documents, this Agreement shall be terminated; otherwise it shall remain in full force and effect.

16. NOTICE. All notices, demands and communications hereunder shall be in writing and shall be deemed to be duly delivered when personally delivered (including by courier or messenger), or two (2) business days after deposit in the United States mail by registered or certified mail, postage prepaid, return receipt requested, addressed to the parties at the addresses set forth on the signature page hereof, or at such other address as any party shall have furnished to the other parties in writing.

17. <u>GOVERNING LAW</u>. To the extent applicable, this Agreement shall be governed by the Uniform Commercial Code of the State of New York (or, to the extent applicable to the attachment, perfection, priority or enforcement of the Security Interest in any Collateral, the Uniform Commercial Code of any other state). With respect to any matters not so covered by the applicable Uniform Commercial Code, this Agreement shall otherwise be governed by the internal laws of the State of New York.

18. <u>ATTORNEYS' FEES AND OTHER COSTS</u>. Should either party hereto institute any action or proceeding to enforce this Agreement or any provisions hereof or for a declaration of rights under this Agreement, or for arbitration of any dispute arising under this Agreement, the prevailing party in any such action, proceeding or arbitration shall be entitled to receive from the other party all costs and expenses, including without limitation reasonable attorneys' fees, incurred by the prevailing party in connection with such action, proceeding or arbitration.

19. <u>INDEMNIFICATION</u>. The Obligor hereby agrees to indemnify and hold harmless the Creditor and its directors, officers, employees and agents against and from any and all claims, actions, liabilities, costs and expenses of any kind or nature whatsoever (including reasonable fees and disbursements of counsel) that may be imposed on, incurred by, or asserted against any of them, in any way relating to or arising out of this Agreement, any exercise of remedies hereunder or any other action taken or omitted by them hereunder, except to the extent a court holds in final and nonappealable judgment that such claims, actions, liabilities, costs and expenses directly resulted from the gross negligence or willful misconduct of such indemnified Persons.

20. <u>WAIVERS BY THE OBLIGOR</u>. Except as otherwise expressly provided in this Agreement or the other Financing Documents, the Obligor waives: (i) presentment, demand, and protest and notice of presentment, protest, default, non-payment, maturity, release, compromise, settlement, extension, or renewal of any or all Financing Documents under or pursuant to which the Obligor may in any way be liable and hereby ratifies and confirms whatever the Creditor may do in this regard; (ii) notice prior to taking possession or control of Collateral or any bond or security that might be required by any court prior to allowing the Creditor to exercise any of the Creditor's remedies; (iii) the benefit of all valuation, appraisement, and exemption laws; (iv) any right to require the Creditor to proceed against any other person or collateral held from any other person; (v) any right to require the Creditor to pursue any other remedy in the Creditor's power whatsoever; or (vi) any defense arising out of any election by Creditor to exercise or not exercise any right or remedy it may have against the Obligor, any other person or any security held by it, even though such election operates to impair or extinguish any right of reimbursement to subrogation or other right or remedy of the Obligor against any other person or any such security.

21. <u>MISCELLANEOUS</u>. The Obligor agrees that the following shall govern the interpretation and enforcement of this Agreement:

21.1 <u>Binding on Successors</u>. This Agreement shall be binding upon the Obligor, the heirs, executors, administrators, successors and assigns of the Obligor, and shall inure to the benefit of and be enforceable by the Creditor, its successors, transferees and assigns.

21.2 "<u>Obligor</u>." If this Agreement is executed by two or more parties (other than the Creditor), they shall be jointly and severally liable hereunder, and the word "Obligor" wherever used herein shall be construed to refer to each of the parties separately, all in the same manner, and with the same effect as if each of them had signed separate instruments, and in any such case, this Agreement shall not be revoked or impaired as to any one or more of such parties by the death or dissolution of any of the others or by the revocation or release of any obligations hereunder of any one or more of such parties.

21.3 <u>Partnerships</u>. If any party hereto is a partnership, this Agreement shall remain in force and applicable notwithstanding any change in the individuals comprising the partnership and shall include any altered or successor partnership, but the predecessor partnerships and their partners shall not thereby be released from any liability.

21.4 <u>No Oral Modifications</u>. None of the terms or provisions of this Agreement may be waived, altered, modified, limited or amended except in a writing signed by the party to be charged

9

21.5    Execution by the Obligor Sufficient. This Agreement shall take effect upon the execution solely by the Obligor but this Agreement may, at the option of the Creditor, be executed by the Creditor if execution by the Creditor is deemed desirable by the Creditor or is required by the laws of any jurisdiction to create, perfect, preserve, validate or otherwise protect any security interest granted pursuant hereto or to enable the Creditor to exercise or enforce its rights hereunder with respect to any such security interest.

21.6    Section Titles. The section titles contained in this Agreement are merely for convenience and shall be without substantive meaning or content.

21.7    Construction. The word "including" shall have the inclusive meaning represented by the phrase "including without limitation." Unless the context of this Agreement clearly otherwise requires, the word "or" shall have the meaning represented by the phrase "and/or," references to the plural include the singular and references to the singular include the plural.

22.     WAIVER OF JURY TRIAL. The Obligor and the Creditor each irrevocably and unconditionally waive trial by jury in any action or proceeding relating to this Agreement or any other Financing Document and for any counterclaim therein.

IN WITNESS WHEREOF, this Agreement is executed and delivered as of the date first set forth above.

CREDITOR: Jagat S. Mehta

OBLIGOR: Finger Lakes Capital Partners LLC

Signature: _____

Name: Jagat S. Mehta

Address: 12 Chelsea Park

Pittsfield, New York 14534

By: _____

Printed Name: Gregory Shalov, Managing Member

By: _____

Printed Name: Zubin Mehta, Managing Member

Address: 168a Irving Avenue

Suite 402

Port Chester, New York 10573

10