**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FINGER LAKES CAPITAL PARTNERS, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 16-22112 (RDD) |

**NOTICE OF LYRICAL OPPORTUNITY PARTNERS, L.P.'S AND JEFFREY
KESWIN'S MOTION TO DISMISS OR CONVERT CHAPTER 11 CASE**

PLEASE TAKE NOTICE a hearing on the attached motion of Lyrical Opportunity

Partners, L.P. and Jeffrey Keswin for an order dismissing the above-captioned chapter 11 case, or

alternatively, converting it to one under chapter 7, will be held before the Hon. Robert D. Drain in

Courtroom 118 of the United States Bankruptcy Court for the Southern District of New York,

located at 300 Quarropas Street, White Plains, New York 10601, on April 8, 2016 at 10:00 a.m.

Any objection to the motion must be filed with the Court and served on movants' undersigned

counsel, so as to be received by March 30, 2016, with a courtesy copy provided to chambers.

Dated: March 4, 2016
      New York, New York

STORCH AMINI & MUNVES PC

/s/ Jeffrey Chubak
Bijan Amini
Avery Samet
Jeffrey Chubak
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100

*Attorneys for Lyrical Opportunity Partners, L.P.
and Jeffrey Keswin*

**Hearing Date and Time: April 8, 2016 at 10:00 a.m.**
**Objection Deadline: March 30, 2016**

Bijan Amini
Avery Samet
Jeffrey Chubak
STORCH AMINI & MUNVES PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100

*Attorneys for Lyrical Opportunity Partners, L.P.*
*and Jeffrey Keswin*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| FINGER LAKES CAPITAL PARTNERS, LLC, | Case No. 16-22112 (RDD) |
| Debtor. | |

**LYRICAL OPPORTUNITY PARTNERS, L.P.'S AND JEFFREY
KESWIN'S MOTION TO DISMISS OR CONVERT CHAPTER 11 CASE**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

BACKGROUND .................................................................................................... 3

I.     PREPETITION LITIGATION ................................................................ 3

     A.     The Delaware Action .............................................................. 3

     B.     The New York Actions ........................................................... 5

II.     CHAPTER 11 CASE ............................................................................. 7

     A.     This is a Two-Party Dispute .................................................. 7

     B.     The Debtor Has No Revenue-Generating Assets................... 9

     C.     The Budget Discloses No Business Expenses ...................... 10

III.     INSIDER TRANSACTIONS ABOUT WHICH THE DEBTOR HAS NOT BEEN FORTHCOMING ................................................................ 10

     A.     The Debtor's Relationship to JumpHawk and Nourish Snacks............................ 10

     B.     Other Insider Transactions................................................... 11

RELIEF REQUESTED AND BASIS THEREFOR .................................................. 14

I.     CAUSE EXISTS TO DISMISS OR CONVERT THIS CASE ....................................... 14

     A.     Cause Exists Within the Meaning of Section 1112(b)(4)(A)............................... 14

     B.     This Case was Commenced in Bad Faith ............................. 16

     C.     The Debtor Cannot use Keswin's Cash Collateral Without his Consent.............. 20

II.     THE COURT SHOULD DISMISS, OR ALTERNATIVELY, CONVERT THIS CASE ................................................................................................. 21

CONCLUSION........................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*A. Illum Hansen, Inc. v. Tiana Queen Motel, Inc. (In re Tiana Queen Motel, Inc.)*,
    749 F.2d 146 (2d Cir. 1984)...................................................................................... 15

*In re Abir*,
    No. 07-12766, 2007 WL 4556909 (Bankr. S.D.N.Y. Dec. 20, 2007) ..................................... 17

*In re Air Vermont, Inc.*,
    39 B.R. 684 (Bankr. D. Vt. 1984)..................................................................................... 20

*Baker v. Latham Sparrowbush Assoc. (In re Cohoes Indus. Terminal, Inc.)*,
    931 F.2d 222 (2d Cir. 1991)............................................................................................. 19

*In re Boynton*,
    184 B.R. 580 (Bankr. S.D. Cal. 1995) .................................................................................... 19

*In re Byrd*,
    172 B.R. 970 (Bankr. W.D. Wash. 1994) ............................................................................. 18

*C-TC 9ʰ Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*,
    113 F.3d 1304 (2d Cir. 1997).......................................................................................... 17-19

*Finger Lakes Capital Partners, LLC v. Honeoye Lake Acquisition, LLC and Lyrical
    Opportunity Partners, L.P.*,
    Civ. A. No. 9742, 2015 WL 6455367 (Del. Ch. Oct. 26, 2015).............................................. 3

*In re Fraternal Composite Serv., Inc.*,
    315 B.R. 247 (Bankr. N.D.N.Y. 2003) ................................................................................. 17

*In re FRGR Managing Member LLC*,
    419 B.R. 576 (Bankr. S.D.N.Y. 2009)............................................................................. 14, 15

*In re HBA East, Inc.*,
    87 B.R. 248 (Bankr. E.D.N.Y. 1988).................................................................................... 16

*In re Johnston*,
    149 B.R. 158 (B.A.P. 9th Cir. 1992).................................................................................... 14

*In re Kanterman*,
    88 B.R. 26 (Bankr. S.D.N.Y. 1988) ..................................................................................... 14

*In re Liptak*,
    304 B.R. 820 (Bankr. N.D. Ill. 2004) .................................................................................... 17

*In re Manville Forest Prods. Corp.*,
  43 B.R. 293 (Bankr. S.D.N.Y. 1984) ................................................................... 21

*In re Marsch*,
  36 F.3d 825 (9th Cir. 1994) ................................................................................. 17

*In re Mense*,
  509 B.R. 269 (Bankr. C.D. Cal. 2014) ................................................................ 19

*In re Nesenkeag, Inc.*,
  131 B.R. 246 (Bankr. D. N.H. 1991) .................................................................. 16

*Pennzoil Co. v. Texaco, Inc.*,
  481 U.S. 1 (1987) ................................................................................................ 19

*In re Pulp Finish 1 Co. (f/k/a Journal Register Co.),*
  No. 12-13774, 2013 WL 5487933 (Bankr. S.D.N.Y. Oct. 2, 2013) ..................... 16

*In re Rundlett*,
  136 B.R. 376 (Bankr. S.D.N.Y. 1992) ................................................................. 15

*In re Sletteland*,
  260 B.R. 657 (Bankr. S.D.N.Y. 2001) ............................................................ 17-20

*In re Soundview Elite, Ltd.*,
  503 B.R 571 (Bankr. S.D.N.Y. 2014) .................................................................. 17

*In re Strawbridge*,
  No. 09-17208, 2010 WL 779267 (Bankr. S.D.N.Y. March 5, 2010) ..................... 15

*In re Syndicom Corp.*,
  268 B.R. 26 (Bankr. S.D.N.Y. 2001) ............................................................... 16-18

*In re Taub*,
  427 B.R. 208 (Bankr. E.D.N.Y. 2010) ................................................................ 14

*In re Wally Findlay Galleries (New York), Inc.*,
  36 B.R. 849 (Bankr. S.D.N.Y. 1984) .................................................................. 19

## **Statutes**

11 U.S.C. § 341 ....................................................................................................... 3

11 U.S.C. § 363 ..................................................................................................... 20

11 U.S.C. § 506(c) ................................................................................................. 21

11 U.S.C. § 1112 ............................................................................................. *passim*

Lyrical Opportunity Partners, L.P. ("Lyrical") and Jeffrey Keswin ("Keswin") hereby move for an order, substantially in the form attached hereto, dismissing this chapter 11 case, or alternatively, converting it to one under chapter 7, pursuant to Bankruptcy Code section 1112(b)(1), and respectfully state:

### INTRODUCTION

1.      This case is a two-party dispute between the above-captioned debtor (the "Debtor"), an asset management firm, and Lyrical, the Debtor's primary investor.  Lined up on the Debtor's side are:

(a)     the Debtor's two members, Gregory Shalov ("Shalov") and Zubin Mehta ("Mehta");

(b)     their parents (as alleged secured creditors, litigation funders, and attorneys); and

(c)     other entities controlled by Shalov and Mehta.

On the other side are Lyrical and Keswin, Lyrical's manager.  The Debtor has no employees and no other significant creditors.  The Debtor has no income and no business expenses.  Simply put, this case is the latest front in the Debtor's war with Lyrical.  There is no reorganizational purpose, just an attempt to continue the fight with Lyrical for the benefit of the Debtor's insiders.

2.      The Debtor initiated this war in 2014 when it sued Lyrical in Delaware Chancery Court seeking millions of dollars from an investment in a portfolio company, Revolabs, Inc., which Lyrical controlled.  The lawsuit was ill-advised because the Vice Chancellor concluded that the Debtor, in fact, owed over money to Lyrical.  Among other things, the Vice Chancellor found the Debtor had been siphoning millions of dollars from its portfolio companies, including Revolabs, in the form of alleged "compensation" for its members.

3.      During the litigation, the Debtor argued the dispute over a loan by Keswin to the Debtor could not be resolved in the Delaware action because Keswin was not a party to that action.

1

This forced Keswin to initiate a New York State court action against the Debtor to enforce its loan repayment obligations, and against Shalov and Mehta as guarantors. At the same time, the Debtor drafted "Security Agreements" for Shalov's and Mehta's parents for the sole purpose of protecting their alleged prior unsecured advances to the Debtor (or its principals) in the event Lyrical or Keswin prevailed in their respective litigations against the Debtor. Unfortunately, again, for the Debtor, Keswin perfected his security interest before the parents perfected theirs.

4.    In addition to being a two-party dispute, the Debtor's case, if not its entire business, is permeated with insider transactions, notably:

(a)    preference period loans by the Debtor to Shalov and/or his wife;

(b)    security interest grants by the Debtor to its principals' parents during the insider preference period;

(c)    undocumented or poorly documented transactions with Shalov's father, Barry Shalov, who was and is acting as attorney for the Debtor and its affiliates;

(d)    reversionary interests in and claims against companies owned and managed by Shalov and Mehta and which pay for the Debtor's lease; and

(e)    preference period payments to an entity with an almost identical name to the Debtor, which Shalov disclaims knowledge of.

The Debtor asserted it has no interest in pursuing, or even investigating, the myriad insider transfers which preceded this filing, including the Debtor's grant of security interests to its principals' parents. Instead, the Debtor seeks to use Keswin's cash collateral to pay Shalov's and Mehta's personal expenses (not Debtor operating expenses), specifically, thousands of dollars in monthly payments on luxury cars.

5.    Finally, the Debtor's principals are continuing their pattern of hiding and misstating assets. When it suits them, they give sworn testimony in one proceeding stating one thing, and then give contradictory sworn testimony in the next proceeding. That pattern has unfortunately repeated itself here, as Shalov's sworn statements to this Court and during the Debtor's Bankruptcy

Code section 341 meeting (the "341 meeting") contradict material testimony the Debtor's principals have offered elsewhere.

6.      Given the two-party nature of this dispute, the Debtor's inability to rehabilitate, the prevalence of insider dealings, and the untrustworthiness of the Debtor's management, Lyrical and Keswin seek dismissal of the case or, in the alternative, conversion and the appointment of a chapter 7 trustee.

## BACKGROUND

## I.      PREPETITION LITIGATION

### A.      The Delaware Action

7.      The Debtor is an asset management firm founded in 2003 by Shalov and Mehta. Shalov Decl. [ECF No. 2] (the "Shalov Decl.") at ¶2; *Finger Lakes Capital Partners, LLC v. Honeoye Lake Acquisition, LLC and Lyrical Opportunity Partners, L.P.*, Civ. A. No. 9742, 2015 WL 6455367, at *1 (Del. Ch. Oct. 26, 2015) (the "Decision"), attached as Ex. 1 to the Chubak Decl. (filed together herewith) (the "Chubak Decl.").

8.      Prior to 2014, the Debtor's business consisted of managing five portfolio companies and Finger Lakes Debt Partners, LLC ("FLDP"), an entity which provided debt financing to some of those companies. For each portfolio company, the Debtor formed a holding company named after one of New York's Finger Lakes (hence the Debtor's name). Lyrical acted as the Debtor's seed investor and provided the "overwhelming majority" of capital to the portfolio companies via investments in the holding companies. *Id.* at *1, 4-10. Revolabs, the portfolio company at the center of the parties' dispute, is a wireless audio equipment manufacturer and was owned and managed by a holding company named Honeoye Lake Acquisitions, LLC ("Honeoye").

3

9.      In early 2014, after three of the five portfolio companies failed, Lyrical learned that Shalov and Mehta had wrongfully paid themselves over $6 million from the portfolio companies. The Debtor was contractually required to share with Lyrical a specific percentage of the income stream paid to the Debtor from the portfolio companies as management fees.  However, the Debtor argued that the bulk of these funds did not need to be shared with Lyrical because they represented compensation due to Shalov in the form of "salary" and "bonuses" paid to him for filling positions at the portfolio companies.  Decision at *11-12.   The Vice Chancellor ultimately found that the Debtor's argument was merely "pretextual" as the funds were paid directly to the Debtor, not Shalov, the Debtor recorded the amounts at issue as "management fees," and Shalov split the fees with Mehta.  *See id.* at *21 ("Mehta and Shalov could not dodge the income sharing provision by calling the fees by a different name").  On February 25, 2014, Lyrical exercised its right to take control of the holding companies.  *Id.* at *12.

10.      A successful liquidity event was subsequently achieved with respect to Revolabs. *Id.* at *17 (sale generated proceeds of over $31 million).  Lyrical proposed to allocate the proceeds distributed to Honeoye in the manner previously agreed to by the parties.  *Id.* at *14.[1]  The Debtor found this unacceptable and in June 2014, the Debtor sued Lyrical and Honeoye in Delaware Chancery Court, seeking to compel Lyrical to distribute over $6 million in sale proceeds.  *Id.*

11.      Trial took place on June 15-16, 2015, during which the parties submitted over two hundred exhibits and introduced live testimony from four witnesses, as well as deposition testimony.  *Id.* at *1.

---

[1] $1.7 million was distributed to the Debtor in 2014 primarily through Honeoye Lake Acquisitions LLC II and III, entities which held ownership interests in Revolabs which Lyrical did not control.  That income constituted the Debtor's sole income for that year.  Statement of Financial Affairs [ECF No. 8] ("SOFA"), Item 1.  Those entities distributed additional proceeds, which had previously been escrowed, in the summer of 2015 and constituted substantially all of the Debtor's income for that year.  *Id.*

12.     On October 26, 2015, the Delaware Chancery Court entered the Decision, and on November 18, 2015, it entered an order on cross-motions for reargument modifying the same. Chubak Decl. at Ex. 2 (the "Reargument Order").  The Decision and Reargument Order resolved a myriad of fact and legal arguments, including the dollar implications of those arguments, all of which were hotly contested by the parties.[2]  Among other things, the Court concluded that not only was the Debtor owed no further funds from Honeoye, but also that the Debtor owed Lyrical an additional $1 million *and* Lyrical would be entitled to the first $9.4 million (over and above its other entitlements) in the event another portfolio company, Rethink Autism, Inc., achieved a liquidity event.  Chubak Decl. at Ex. 3 (the "Judgment").

13.     The Judgment was entered on January 22, 2016.  On January 28, 2016, the Debtor filed its appeal of the Judgment, and on January 29, 2016, the Debtor commenced this case.

**B.     The New York Actions**

14.     On August 1, 2006, the Debtor, together with Shalov and Mehta, as guarantors, executed a promissory note, pursuant to which they promised to repay up to $1,000,000 of any funds advanced by Keswin, plus interest, and granted Keswin a first priority lien in all assets held by the Debtor, its principals, and affiliates (the "Keswin Note").  Cash Collateral Mot. at Ex. A. On the same date, Keswin advanced $400,000 under the Keswin Note.  Decision at *8, 22. Because the Debtor lacked the funds to repay the Keswin Note by the applicable maturity date, the parties agreed (through a series of written e-mails between 2008 and 2010) that the Keswin Note remained outstanding and payable and would be paid once the Debtor achieved a positive return on its investment portfolio.  Chubak Decl. at Ex. 4 (Keswin Aff. at ¶¶9-12).

---

[2] For example, post-Decision briefing concerned the Debtor's argument that even if the Decision were correct, the Vice Chancellor still miscalculated the amounts owed to Lyrical.  Reargument Order at ¶¶4, 7.

15.     On May 18, 2015, Lyrical filed its pre-trial brief in the Delaware action.  Among other things, Lyrical argued amounts due under the Keswin Note should be included in the calculations of what the Debtor owed to Lyrical.  Chubak Decl. at Ex. 5 (Lyrical Opening Br. at 64).

16.     The Debtor immediately attempted to impair Keswin's position by granting security interests to its principals' parents on account of monies previously advanced to the Debtor (or to the principals) a decade earlier.  Specifically, on May 22, 2015 (just four days later), the Debtor executed two security agreements:  one with Joan and Barry Shalov (Shalov's parents) and one with Jagat Mehta (Mehta's father).[3]  Cash Collateral Mot. at Exs. E, H.  Shalov's parents did not execute their security agreement.  Both security agreements explicitly provide that the parents are taking their security interests subject to the "unperfected lien, if any lien at all, of Jeffrey Keswin."  *Id*. at § 4.2.[4]

17.     In addition to being Shalov's father, Barry Shalov was then acting as an attorney advising the Debtor, including with respect to the Delaware action with which he was intimately involved.[5]

18.     On May 30, 2015, the Debtor filed a response brief arguing, *inter alia*, because Keswin was not a party to the Delaware action, Lyrical could not seek to include his promissory note in any clawback/offset calculation. Chubak Decl. at Ex. 6 (Debtor Answering Br. at 32 n.7).

---

[3] The security agreements are dated "as of May 22, 2015."  Lyrical and Keswin do not concede the authenticity of these documents of the truth of the matter contained therein and reserve the right to challenge the same.

[4] Keswin had originally perfected lien in 2006 contemporaneously with the advance of funds.  However, during the litigation, both parties' realized that no renewal lien had been filed.  Thus, Keswin refiled his lien on June 17, 2015, ahead of Shalov's parents and Mehta's father (who perfected July 21, 2015 and August 14, 2015, respectively).  Cash Collateral Mot. at Exs. B, F, I.

[5] Among other things, the Debtor's privilege log affirmatively claimed Barry Shalov to be the Debtor's attorney and claimed the attorney-client privilege with respect to all communications with him.

In response, on June 24, 2015, Keswin filed suit against the Debtor, Shalov, and Mehta seeking to recover on the Keswin Note and later withdrew the Keswin Note from consideration in the Delaware action.[6]  By order dated December 2, 2015, the New York State Court denied both parties' motions for summary judgment on the grounds that factual issues prevented summary disposition.  Chubak Decl. at Ex. 8.

19.     In addition, on July 17, 2015, Lyrical filed a second action in New York State Court in connection with efforts to enforce a $2.25 million promissory note issued by FLDP to Lyrical. At a January 19, 2016 hearing, the Court granted summary judgment to Lyrical.

## II.    CHAPTER 11 CASE

### A.    This is a Two-Party Dispute

20.     On January 29, 2016, the Debtor commenced this case for the sole purpose of continuing its litigation with Lyrical.[7]

21.     The Debtor scheduled three secured creditors:   Keswin, Shalov's parents and Mehta's father.  Schedules of Assets and Liabilities [ECF No. 8] ("Schedules"), at Schedule D. The accrued balance on Keswin's perfected-first-in-time secured claim is roughly $1.4 million,

---

[6] Keswin's motion for summary judgment in lieu of complaint expressly acknowledged the action was being filed to address the Debtor's defense raised in the Delaware action.   Chubak Decl. at Ex. 7, at 4 ("This action is filed to address that defense").

[7] Shalov Decl. at ¶25 (the "Purpose of the Chapter 11 Filing" is "to appeal and reverse the Revolabs decision in the Delaware action"); 341 Tr. at 27:10-24 (U.S. Trustee: "why did the Debtor get into Chapter 11 … " Shalov: "We sold a company … for a substantial sum of money.  Lyrical believed that they were entitled to X dollars; we believed we were entitled to Y dollars.  We sued Lyrical and lost … [T]o protect our other creditors and ourselves, we are filing a Chapter 11 so we can pursue an appeal.  Otherwise we would not have the funds to do so"); 341 Tr. at 30:17-31:2 (Shalov: "the [Florida] lawsuit is not a reason we are filing. We believe … it's a frivolous lawsuit.  So I don't want to state at all that that has anything to do with this." U.S. Trustee: So you're in mostly because of Lyrical then?"  Shalov: "Yes."  U.S. Trustee: Or only because of Lyrical."   Shalov: "Only because of Lyrical"); Stay Relief Mot. [ECF No. 13] at ¶24 ("the [case] primarily involves only two parties, the Debtor and Lyrical").

and continues to accrue interest at 20% per annum.[8]  Shalov parents' secured claim was scheduled in the amount of approximately $2.7 million and Mehta father's claim was scheduled in the amount of approximately $550,000.

22.    The Debtor intends to challenge Keswin's claim but affirmatively acknowledges the parents' claims as valid.[9]

23.    The Debtor scheduled seven unsecured claims, including Lyrical's Judgment. These debts were "mostly incurred due to Lyrical's litigation and related actions," and consist primarily of amount due to "professionals, credit card companies, family members, and other investors."  *Id.* at ¶27.[10]

---

[8] In an attempt to re-litigate the issue, the Debtor now argues that the Keswin note was never funded.  *See* Cash Collateral Mot. at ¶¶8, 17 and *compare with* Decision at *22 ("Keswin personally loaned $400,000 to Finger Lakes.  Shalov and Mehta guaranteed the loan"); Chubak Decl. at Ex. 9 (Jan. 8, 2016 so ordered Tr. at 10:9-12) (Debtor's counsel: "The chronology is basically correct as [Keswin's counsel] lays it out; but just briefly, your Honor, the note is executed on August 1st, 2006.  $400,000 is wired to Finger Lakes"); Chubak Decl. at Exs. 10-11 (June 15, 2015 Trial Hr'g Tr. at 291:3-293:3 and June 16, 2015 Trial Hr'g Tr. at 530:15-532:3 (Mehta and Shalov trial testimony, respectively)); Cash Collateral Mot. at Ex. A (wire confirmation of funds transferred, attached as last page of exhibit).

[9] *See* Cash Collateral Mot. at ¶23 ("The Debtor believes the Shalovs have several new value and fair consideration defenses against any potential avoidance claim"); *id.* at ¶24 ("Debtor has no objection" to the parents' position their liens are "valid, perfected, and enforceable as of the Petition Date"); Shalov Decl. at ¶33 (the parents' secured claims are "undisputed," whereas Keswin's secured claim is "disputed"); Schedule D (same); 341 Tr. at 49:23-50:13 (acknowledgment by Shalov the Debtor has not investigated prepetition transfers to relatives).

[10] The following are the Debtor's scheduled, non-Lyrical unsecured creditors:

(a)  Debtor's counsel and local counsel in the Delaware action (together owed approximately $30,000);

(b)  Debtor's accountant/tax advisor (owed $30,000);

(c)  credit card issuer (owed approximately $100,000);

(d)  Shalov's sister (owed approximately $10,000); and

(e)  two Florida residents who commenced a now-stale, "frivolous" lawsuit against the Debtor in 2008 which is subject to dismissal for failure to prosecute.  *See* Chubak Decl. at Ex. 12 (Feb. 24, 2016 Bankruptcy Code section 341 Meeting Tr. or "341 Tr.") at 28:18-30:24, 30:17-21, 42:2-43:4 (discussing lawsuit).

### B.    The Debtor Has No Revenue-Generating Assets

24.    The Debtor's only scheduled assets are indirect ownership interests in portfolio companies, a $2,000 desk, an office lease paid for by a related entity, and a $250,000 receivable from Generate Holdings LLC d/b/a JumpHawk ("JumpHawk"), a search engine optimization company in which each of Shalov and Mehta (personally) have a roughly 20% ownership interest. 341 Tr. at 10:10-11:18.  The Debtor suggests the JumpHawk receivable is merely a "pass through" of a loan that Barry Shalov made through the Debtor.  *Id.* at 38:12-39:10.

25.    In addition, the Debtor also scheduled ownership interests in nine holding companies (named after the Finger Lakes and used to hold interests in the portfolio companies). The holding companies, together with the corresponding portfolio company and value of the ownership interests are listed below:

| Holding Company (Interest) | Portfolio Company | Ownership Interest Value |
|---|---|---|
| Honeoye Lake Acquisitions LLC (Class B) | Revolabs, Inc. | Subject of Delaware appeal. |
| Honeoye Lake Acquisitions LLC II | | Fully distributed. |
| Honeoye Lake Acquisitions LLC III | | Fully distributed. |
| Canandaigua Lake Acquisition LLC (Class B) | Performance Trailers, Inc. | Total loss.  Decision at *11-12, *18. |
| Seneca Lake Acquisition (Class B) | Tiber Industries, Inc. | |
| Keuka Lake Acquisition (Class B) | Portadam, Inc. | |
| Owasco Lake Acquisition LLC (Class B) | Rethink Autism, Inc. | As of mid-June 2015, it was unclear if Rethink would be a success. Decision at *12. |
| Owasco Lake Acquisition II, LLC (Class B) | | |
| Cayuga Lake Acquisition, LLC (Class B) | Nourish Snacks, Inc. | Unknown. |

According to the Debtor, only three holding companies potentially have any future value. *Id.* at 22:12-23:17.  However, these interests will only prove valuable if/when a liquidity event occurs, and until such time the Debtor receives no revenue from its indirect interests in Rethink and Nourish.  *See* Cash Collateral Mot. at Ex. K (budget); Shalov Decl. at Ex. B (budget) (together, the "Budget").[11]

### C.    The Budget Discloses No Business Expenses

26.    $4,000 of the Debtor's proposed $4,125 monthly Budget consists of payments for the family cars and cell phone plans of Shalov and Mehta.  The Debtor apparently pays for four cars owned by Shalov and Mehta in the amounts of $1,000, $590, $590, and $1,300.  *Id.*; *see also* 341 Tr. at 12:2-15:6.[12] The Budget indicates the Debtor has no employees and does not pay rent.

## III.    INSIDER TRANSACTIONS ABOUT WHICH THE DEBTOR HAS NOT BEEN FORTHCOMING

### A.    The Debtor's Relationship to JumpHawk and Nourish Snacks

27.    As discussed above, the Debtor's sole scheduled intangible asset other than its holding companies is a $250,000 receivable from JumpHawk.  At the 341 exam, the Debtor also asserted a carried interest in Nourish.  341 Tr. at 22:12-23:17.

28.    The Debtor claims it does *not* manage JumpHawk or Nourish. Id. at 40:4-11.  This assertion is difficult to credit as Shalov and Mehta founded, run, and invested in these companies:

---

[11]  The Debtor stated in SOFA, Item 1 its estimated gross income for January 2016 was $4,000 but acknowledged this amount was compensation for a short-term consulting project.  341 Tr. at 17:20-18:3.  Moreover, substantially all of the prior year's revenues were distributions from the Revolabs sale.  *Id.* at 43:6-13.

[12] The amount budgeted per vehicle is outrageously high and inconsistent with behavior expected of an estate fiduciary.

    (a)    Shalov and Mehta claim to be the founders of Nourish and are listed on the company's website as the "Boss" and the "Boss' Boss," respectively. Chubak Decl. at <u>Ex. 13</u> (Nourish webpage);[13]

    (b)    Shalov previously testified he and Mehta were hired to "monitor" Nourish, which they do "through" the Debtor, and that the Debtor "has a carried interest" in Nourish. Chubak Decl. at <u>Ex. 14</u> (Apr. 27, 2015 Shalov Dep. Tr. ("<u>Shalov Dep. Tr.</u>") at 165-69); *see also* 341 Tr. at 23:7-17.

    (c)    Shalov and Mehta are the founders, chief officers, and owners of JumpHawk. *Id*. at 11:12-18;

    (d)    Nourish and JumpHawk share the same address as the Debtor and both pay the Debtor's rent. *Id*. at 16:23-17:3;

    (e)    The Debtor borrowed $250,000 to fund JumpHawk. *Id*. at 38:25-39:10;[14] and

    (f)    The Debtor set up another special purpose entity (Cayuga Lake) to invest in Nourish and claims a "carried-interest potential." *Id*. at 23:8-17.

In short, the Debtor's relationship with JumpHawk and Nourish looks exactly like its relationship with the other portfolio companies described in the Decision – including the practice of extracting management fees in the form of direct salary.[15]

### B.    Other Insider Transactions

29.    <u>Alleged loans to Shalov or his wife</u>.  During the preference period, the Debtor extended a loan to either Shalov (341 Tr. at 21:10-11) or Danielle Shalov, Shalov's wife (*id.* at 45:7-48:8).  There is no loan document (*id.* at 48:11-12) or clarity as to how much was advanced or repaid or when (*id.* at 47:25-48:3).  This was at a time when the Debtor had no revenue and claims to have been borrowing money from Shalov's parents.

---

[13] Shalov testified that he is not an officer (341 Tr. at 41:13-15), but stated he is employed by Nourish (Shalov Dep. Tr. at 165:21-22), subject to the caveat he does not receive a W-2 (*id.* at 24:22-225:15).

[14] Previously, Shalov testified that "Generate Holdings [JumpHawk] has nothing to do with FLCP."  Shalov Dep. Tr. at 165:22-23.

[15] *See* Decision at *21 ("Everything Mehta and Shalov testified that they did at the portfolio companies … was consistent with and part of Finger Lakes' role in managing its assets to maximize their value").

30.    <u>Alleged loans from Shalov's Parents</u>.  As discussed above, the Debtor alleges to
have granted Shalov's parents a security interest during the insider preference period to secure
prior advances of approximately $1.9 million.  The Debtor also claims Shalov's parents advanced
$765,000 after being granted the security interest.  Cash Collateral Mot. at ¶20, Ex. D.[16]  The
Debtors claim all of that money went to JumpHawk and the Debtor's lawyers.  341 Tr. at 38:15-
39:18, 51:19-52:14.  However, neither of Debtor's proposed counsel filed a *Lar Dan* declaration,
which is required in this district where a retainer is supplied, even indirectly, by a nondebtor third
party.

31.    <u>Mehta's father's lien</u>.  Mehta's father filed a UCC-1 Statement in August 2015,
three months after the Debtor executed a security agreement.  The Debtor asserts Mehta's father
last advanced funds a decade ago.  Other than a "confirmation letter" executed by the Debtor in
2015, the advance is undocumented.

32.    <u>Preference payments to FCPC, LLC</u>.  Although the Debtor claims no ongoing
business expenses and claims to have paid just four parties during the preference period, Shalov
could not identify FCPC, LLC, an entity paid $5,000/month.  341 Tr. at 43:22-44:23.[17]

33.    <u>Finger Lakes Debt Partners</u>.  The Debtor fails to schedule its interest in FLDP as
estate property.  Schedule A/B.  In a sworn affidavit, Shalov claimed that he is FLDP's managing

---

[16] Further investigation is required as to the nature of this loan, particularly given that the Debtor's basis
for awarding Shalov's parents adequate protection is that they extended subsequent new value thereunder.
The face of the note states it was issued to commit to writing $350,000 in principal amount of loans extended
*prior to* May 22, 2015.  The next sentence, however, provides principal amount and dates of loans extended
by the parents to the Debtor under the note are as set forth on Schedule A, which in turn does not reflect
any pre-May 22, 2015 loan but rather states loans were extended between May 27, 2015 and October 14,
2015.

[17] FCPC's name is similar to the Debtor's (FLCP). Like the Debtor's other affiliates, FCPC is a Delaware
corporation registered in New York (Westchester County), even though it lists an address solely in
Connecticut where it is not registered.  Moreover, the company was formed just two years ago.  Chubak
Decl. at <u>Ex. 16</u>.

partner and that he and Mehta are its only members.[18]  Elsewhere, he has claimed FLDP is owned

by many parties including, *inter alia*, the Debtor, Shalov's parents, Shalov's sister, and Lyrical.

Chubak Decl. at Ex. 18 (Capitalization Table); Chubak Decl. at Ex. 19 (Apr. 28, 2015 Mehta Dep.

Tr. at 17:8-19:14).  At his 341 exam, Shalov refused to state whether he had a personal interest but

claimed the Debtor had a right of indemnification from FLDP.  341 Tr. at 33:5-35:19.  The FLDP

operating agreement states the Debtor is its managing member and is entitled to management fees,

among other rights.  Chubak Decl. at Ex. 20.

34.    Payments to Shalov and Mehta.  The Debtor's schedules state only that only insider

preferences were unspecified "expense reimbursements" made to Shalov and Mehta.  SOFA, Item

4.  Although five weeks have passed since the petition date, the Debtor has not disclosed such

payments.

35.    No investigation into Insider Transfers.  The Debtor admitted it did not investigate

transfers made to its principals' insider relatives.  341 Tr. at 50:8-13.

36.    Dissipation of Revolabs Sale Proceeds.  Finally, the Debtor claims to have received

approximately $1.7 million from the Revolabs sale in 2014.  While the Debtor was unable to say

if any of those funds remained in 2015 (341 Tr. at 53:8-54:4), it appears likely that the Debtor

simply distributed those funds.[19]   An investigation is required as to whether the funds were

fraudulently transferred.

---

[18] On October 2, 2015, Shalov submitted a sworn affidavit stating that *he* was FLDP's managing member
and that he and Mehta were the *sole* members.  Chubak Decl. at Ex. 16 at ¶17.  *See also* Chubak Decl. Ex.
17 at 5, 11 (Opp. to Lyrical's Motion for Summary Judgment in Lieu of Complaint) ("Finger Lakes Capital
Partners, LLC – an entity whose Managing Partners and only members are identical to the Managing
Partners and ONLY members of [FLDP]").

[19] The Debtor has no other expenses, in 2015 earned $298,000, and received an additional $765,000 to pay
lawyers and invest in JumpHawk, but was left with just $48,000 in the bank in January 2016.

## RELIEF REQUESTED AND BASIS THEREFOR

37.     By this motion, Lyrical and Keswin request entry of an order dismissing this case, or alternatively, converting it to one under chapter 7.[20]

## I.     CAUSE EXISTS TO DISMISS OR CONVERT THIS CASE

### A.     Cause Exists Within the Meaning of Section 1112(b)(4)(A)

38.     Section 1112(b)(4) provides a non-exclusive list of factors that constitute cause under section 1112(b)(1).  Subsection (A) provides cause includes "substantial … loss to … the estate and the absence of a reasonable likelihood of rehabilitation."  Both prongs are satisfied in the instant case.

39.     The estate will continue to incur substantial losses.  Absent dismissal or conversion, the estate will bleed legal fees to pay for Debtor's proposed bankruptcy and appellate counsel, to the estate's detriment, which in turn qualifies as substantial loss to the estate under section 1112(b)(4)(A) (even excluding Budgeted personal expenses).  *In re Taub*, 427 B.R. 208, 232 (Bankr. E.D.N.Y. 2010) (substantial loss exists where "[t]he estate has reported negative cash flow since this case began, and the unpaid administrative expenses … continue to grow"); *In re FRGR Managing Member LLC*, 419 B.R. 576, 581 (Bankr. S.D.N.Y. 2009) ("As to the first prong, it is apparent from the facts [debtor's] actions are causing a diminution to the estate.  FRGR continues to incur quarterly U.S. Trustee fees as well as legal fees, causing continuing loss to the estate"); *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988) ("All that need be found is that the estate is suffering some diminution of value"); *In re Johnston*, 149 B.R. 158, 161 (B.A.P. 9th Cir. 1992) (granting motion to convert where debtor had no income and further delay would reduce creditor

---

[20] Even if the Court denies this relief, at the very least this Court should appoint a chapter 11 trustee pursuant to section 1112(b)(1) or, barring that, grant Lyrical and Keswin the right to investigate and bring suit derivatively.

recoveries); *see also* 7 Collier on Bankruptcy ¶1112.04[5][1] (16th ed.) ("if the debtor is operating

with a sustained negative cash flow after the commencement of the case, these facts are sufficient

to justify a finding of 'substantial or continuing loss to … the estate'").

40.    <u>No reasonable likelihood of rehabilitation</u>.    "Rehabilitation" under section

1112(b)(4)(A) means "the debtor will be reestablished on a sound financial basis, which implies

establishing a cash flow from which current obligations can be met." *In re Rundlett*, 136 B.R. 376,

380 (Bankr. S.D.N.Y. 1992).    *See also* 7 Collier on Bankruptcy ¶1112.04[6][a][ii]  (16th ed.)

("Rehabilitation is not another word for reorganization.  Rehabilitation means to reestablish a

business.  Whereas confirmation of a plan could include a liquidation plan, rehabilitation does not

mean liquidation"); 7 Collier on Bankruptcy ¶1112.04[5][a] (16th ed.) ("The standard under section

1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but rather, whether

the debtor's business prospects justify continuance of the reorganization effort").  Here, the Debtor

acknowledged it has no revenues and will not realize business income absent the sale of Rethink

or Nourish.  Given this, to avoid liquidating, the Debtor must achieve complete victory on appeal:

not only must it prevail on its own claims, it must obtain reversal of the Judgment on the

counterclaims.  *See also* Shalov Decl. at ¶¶3, 15-16, 25-27 (Debtor has reasonable likelihood of

reorganizing as it will prevail on appeal).  However, putting aside the fact that the Decision is

based upon factual findings concerning the parties' course of dealing which are subject to clear

error review, it is well established a debtor's predictions of success on appeal is not a basis for

denying relief under section 1112(b)(1). *A. Illum Hansen, Inc. v. Tiana Queen Motel, Inc. (In re

Tiana Queen Motel, Inc.)*, 749 F.2d 146, 151 (2d Cir. 1984) (debtor's "boundless confidence" it

will confirm a plan is not a sufficient basis on which to conclude rehabilitation is possible); *FRGR*,

419 B.R. at 581-85 (cause under 1124(b)(4)(A) existed where debtor had no assets other than

litigation claim *without* evaluating merits of the underlying litigation, collecting cases); *In re*

*Strawbridge*, No. 09-17208, 2010 WL 779267, at *4 (Bankr. S.D.N.Y. March 5, 2010) ("Nor may [debtor] finance a plan … through potential recovery of her litigation claims pending in the district court").

**B.      This Case was Commenced in Bad Faith**

41.      Chapter 11 cases filed in bad faith may be dismissed or converted for cause.  *In re Pulp Finish 1 Co. (f/k/a Journal Register Co.)*, No. 12-13774, 2013 WL 5487933, at *2 (Bankr. S.D.N.Y. Oct. 2, 2013) ("although not listed, the Court may convert or dismiss a case that was filed in bad faith"); *In re HBA East, Inc.*, 87 B.R. 248, 258 (Bankr. E.D.N.Y. 1988) ("inherent in the statute and clearly inferred in 11 U.S.C. § 1112(b) is the requirement of good faith on the part of the debtor to file and maintain a Chapter 11 case").

42.      "Bad faith filing does not itself mean bad mind or malicious activity … but simply the causing of a reorganization proceeding to be filed that does not fit within the intended scope of chapter 11 relief as that chapter [was] enacted by Congress."  *In re Syndicom Corp.*, 268 B.R. 26, 49 (Bankr. S.D.N.Y. 2001) (quoting *In re Nesenkeag, Inc.*, 131 B.R. 246, 247 (Bankr. D. N.H. 1991)).

43.      "Courts have considered the following factors as bearing on the debtor's good faith and as important in deciding a motion [for relief under section 1112(b)(1)] in the face of a judgment that the debtor seeks to appeal:"

(a)      whether payment of an appeal bond would disrupt debtor's business or affect employees;

(b)      whether the debtor transferred assets beyond the reach of creditors;

(c)      whether the case is a two party dispute;

(d)      whether the debtor exhausted state law remedies in attempting to appeal without posting a bond;

(e)      the expense of the appeal; and

(f)     whether the bankruptcy case is an attempt to re-litigate an unfavorable state court decision.

*In re Sletteland*, 260 B.R. 657, 663 (Bankr. S.D.N.Y. 2001); *see also In re Abir*, No. 07-12766, 2007 WL 4556909, at *7 (Bankr. S.D.N.Y. Dec. 20, 2007); *In re Fraternal Composite Serv., Inc.*, 315 B.R. 247, 252 (Bankr. N.D.N.Y. 2003) (same).[21]

44.     Each of these factors weighs in favor of relief under section 1112(b)(1).

45.     <u>No disruption to ongoing business or employees</u>.  A chapter 11 case commenced to facilitate prosecution of an appeal is a bad faith filing where judgment enforcement would not disrupt the debtor's business.  *Sletteland,* 260 B.R. at 666 ("Another key factor … courts have considered on the issue of 'good faith' is whether the debtor is engaged in business or has employees and whether the judgment would force a 'business' to close and liquidate"); *In re Marsch*, 36 F.3d 825, 829 (9th Cir. 1994) (affirming dismissal on bad faith grounds "because [debtor] wasn't involved in a business venture [and thus] the judgment didn't pose any danger of disrupting business interests"); *Syndicom*, 268 B.R. at 54 (cause under section 1112(b)(1) exists where "the Debtor has no business [and] is no more than a shell").  Here, the Debtor claims to have no business except holding indirect ownership interests in two portfolio companies.  None of the Debtor's limited assets are generating revenues for the Debtor.  No employees would be affected by dismissal or conversion of this case.  Nobody, not even Shalov or Mehta, look to the Debtor for their livelihood.

---

[21] *See also C C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1311 (2d Cir. 1997) (using similar factors to evaluate if cause existed to a grant secured creditor's motion to dismiss a debtor's chapter 11 case on bad faith grounds).  However, "while the *C-TC* Factors are not applicable solely to cases involving actions against property, they tend to apply to a … lesser degree in other cases."  *In re Soundview Elite, Ltd.*, 503 B.R 571, 580 (Bankr. S.D.N.Y. 2014).  *See also In re Liptak*, 304 B.R. 820, 836 (Bankr. N.D. Ill. 2004) ("If the debtor's only purpose for filing the case is to delay (or defeat) a single judgment creditor … then the debtor has not filed the Chapter 11 case in good faith").

46. <u>Debtor transferred property to insiders prepetition</u>. The prepetition transfer of property to frustrate collection efforts "is a core reason for finding a debtor in bad faith." *Sletteland*, 260 B.R. at 664. The Debtor did exactly that by granting security interests to Shalov's and Mehta's parents, years after they advanced the funds at issue, so the parents could bootstrap their way up the Debtor's capital structure. The Debtor also avoided disclosing prepetition transfers to Shalov and Mehta, incorrectly scheduled Shalov's wife as a non-insider despite having loaned her significant amounts of money during the insider preference period, and offered only evasive answers to questions at the 341 meeting concerning FCPC, LLC, which the Debtor paid $5,000/month (and which may also be incorrectly identified as a non-insider). At a minimum, the grant of Mehta's father's lien, without the receipt of any new value, should be considered a bad faith attempt to frustrate collection efforts. The other transfers, and the apparent existence of undisclosed transfers, are suspicious on their face and merit further investigation.

47. <u>This is a two-party dispute</u>. Bankruptcy courts regularly grant relief under section 1112(b)(1) where a chapter 11 case was commenced to obtain a strategic advantage in two-party disputes. *C-TC*, 113 F.3d at 1311 ("For such two-party disputes, the state court, which has been overseeing the case, is a preferable forum"); *Syndicom*, 268 B.R. at 54 (same). Shalov admitted this is a two-party dispute at the 341 meeting. *See supra*, note 7. Moreover, undisputed, non-insider claims pale in size compared to Lyrical's and Keswin's ($1 million and $1.4 million).

48. <u>Debtor has not exhausted state remedies</u>. The Debtor has not sought a stay pending appeal from a Delaware court, or indicated it explored the possibility of prosecuting the appeal without posting a bond or with just a limited bond. *Sletteland*, 260 B.R. at 665 (quoting *In re Byrd*, 172 B.R. 970, 972 (Bankr. W.D. Wash. 1994)) (cause exists under section 1112(b)(1) "[u]nless the debtor can demonstrate that he has no alternative to stay the Committee's judgment other than by Chapter 11").

18

49. <u>Fair allocation of appeal expenses</u>. If the Debtor is permitted to remain in chapter 11, its attorneys' fees will be treated as administrative expenses, which would be paid ahead of Lyrical and Keswin. *See In re Boynton*, 184 B.R. 580, 583 (Bankr. S.D. Cal. 1995) (case filed in bad faith where, "[i]n practical effect, the [judgment creditor] is funding the appeal against itself while it is prevented from seizing [debtor property] and while the debtor avoids the requirement of an appeal bond"); *Sletteland*, 260 B.R. at 666 (same); *In re Mense*, 509 B.R. 269, 284 (Bankr. C.D. Cal. 2014) (same).

50. <u>Attempts to relitigate should not be countenanced</u>. The availability of bankruptcy relief is not an invitation to relitigate issues decided in state court. *C-TC*, 113 F.3d at 1310 (citing *Baker v. Latham Sparrowbush Assoc. (In re Cohoes Indus. Terminal, Inc.)*, 931 F.2d 222, 227 (2d Cir. 1991)) ("an entity may not file a petition for reorganization … designed to attack a judgment collaterally – the debtor must have some intention of reorganizing"); *In re Wally Findlay Galleries (New York), Inc.*, 36 B.R. 849, 851 (Bankr. S.D.N.Y. 1984) ("The debtor filed its petition herein to avoid the consequences of adverse state court decisions while it continues litigating. This court should not, and will not, act as a substitute for a supersedeas bond of state court proceedings … The debtor is unable to propose a meaningful plan of reorganization until its litigation … is resolved. Thus, it is evident that the debtor seeks to use this court not to reorganize, but to relitigate. This is an impermissible use of Chapter 11"). As noted above, the Debtor has made clear the purpose of its case is to frustrate Judgment enforcement efforts, and likewise could not propose a meaningful plan until its appeal is resolved. *See supra*, note 7.

51. <u>A Word about *Texaco*</u>. The Debtor analogized this case to "the seminal *Texaco* decision" in Shalov Decl. at ¶3, as though its mere incantation justifies the commencement of a bankruptcy case to improve one's position in a two-party dispute. However, as this Court is no doubt well aware, *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987) addressed the propriety of a

district court injunction prohibiting Pennzoil from executing on its judgment while Texaco exhausted its appellate remedies, and without having to post a bond.  The Supreme Court never addressed whether Texaco's chapter 11 case, which was commenced on April 12, 1987, six days after the Supreme Court directed the lifting of such injunction, was filed in good or bad faith, and the parties never litigated a motion to dismiss/convert Texaco's chapter 11 case on bad faith grounds.  *Sletteland*, 260 B.R. at 663 n.3.  In fact, Justice Blackmun suggested Texaco's commencement of a bankruptcy case solely to gain the benefit of the automatic stay and to prevent Pennzoil from collecting on its judgment prior to appellate finality would be bad faith.  *Id*. at 21 n.* (Blackmun, J., concurring) ("the suggestion that Texaco could enter a Chapter 11 proceeding, pursue its appeal, and then reemerge from this proceeding to continue 'business as usual' strikes me as somewhat at odds with the reality of corporate reorganization that might occur in bankruptcy, especially on the facts of this case").

### C.      The Debtor Cannot use Keswin's Cash Collateral Without his Consent

52.     Cause also exists because the Debtor cannot use Keswin's cash collateral without his consent under Bankruptcy Code section 363 and is unable to adequately protect him.  As noted above, the Debtor's sole substantive first day motion seeks permission to use Keswin's cash collateral.  Keswin's claim is presumptively underwater as it is unclear what value, if any, the Debtor's indirect interests in Rethink and Nourish are worth, and no evidence of value has been submitted in connection with the Cash Collateral Mot.  *See* 11 U.S.C. § 363(p)(1) (debtor has burden of proof on the issue of adequate protection).  Thus, any proposed use of Keswin's cash collateral will result in a dollar-for-dollar diminution in the value of his secured claim.  The Debtor's offer of adequate protection in the form of "replacement liens" on collateral already securing his claim is insufficient.  *In re Air Vermont, Inc.*, 39 B.R. 684, 687 (Bankr. D. Vt. 1984) (adequate protection insufficient where "Debtor does not have enough equity in any property upon

which it might grant a replacement lien"). Moreover, the Debtor has no unencumbered property

with which Keswin can otherwise be adequately protected. Without the use of Keswin's cash

collateral, the Debtor has insufficient funds to administer this case.[22]

## II.   THE COURT SHOULD DISMISS, OR ALTERNATIVELY, CONVERT THIS CASE

53.   Pursuant to section 1112(b)(1), upon a showing of cause, this Court must convert

or dismiss this case, "whichever is in the best interests of creditors and the estate."

54.   Dismissal of this case is appropriate as this is essentially a two-party dispute that

should be resolved expeditiously, and on the merits, in the appropriate forums. Forcing a trustee

to referee what will likely be contentious disputes between the Debtors' insiders and

Lyrical/Keswin, is not in the best interests of the estate. Nor is there strong likelihood of any

distribution to unsecureds regardless of the outcome of the disputes, especially given the Debtor's

existing capital structure.

55.   Alternatively, conversion would afford a trustee the opportunity to objectively

evaluate the many questions raised by this filing, including:

(a)   The appeal. Does it make sense to pursue the appeal? If so, should the estate incur the cost of paying Debtor's proposed appellate attorneys or try to retain contingency appellate counsel?

(b)   Parents' liens. Mehta's father's lien likely can be avoided. To what degree can Shalov's parents' lien be avoided and their claim treated as unsecured? To what extent does Barry Shalov have liability for acting as counsel and creditor in connection with the Debtor's grant of a security interest to him?

(c)   Guarantees of parents' loans. Can the estate recover against Shalov and Mehta personally on account of their guarantees of the Debtor's repayment obligations to the parents?[23]

---

[22] As noted above, the Debtor disputes the validity of Keswin's claim and lien, but has not taken action to avoid the same. Until the lien is avoided, the lien is valid and Keswin is entitled to adequate protection. Nor may the Debtor surcharge his collateral except as provided in Bankruptcy Code section 506(c).

[23] The Debtor's bankruptcy filing accelerated all debts owed by the Debtor by operation of law, notwithstanding the absence of a maturity date in the letter agreements. *See In re Manville Forest Prods.*

      (d)     <u>Prepetition transfers to Shalov, Mehta</u>.  What transfers were paid to Shalov or Mehta, or entities under their control, during the year preceding the petition date?  What happened to the $1.7 million earned by the Debtor in 2014?  Do any transfers qualify as management fees payable to Lyrical?  *See* Decision at *21 (quoted above).

      (e)     <u>Prepetition transfers to spouses, other relatives</u>.  What unscheduled transfers were made to Shalov's and Mehta's spouses, or other relatives during the year preceding the petition date?

      (f)     <u>Prepetition transfers to FCPC, LLC</u>.  Is this entity an insider affiliate?  Why was the Debtor paying it $5,000/month?

      (g)     <u>Prepetition transfer to Kegan Law Firm</u>.  To what degree is the Debtor's January 20, 2016 $25,000 transfer to its proposed appellate counsel recoverable as a preference?  (How much new value was conferred between the transfer and petition date?)

      (h)     <u>Affiliate transactions</u>.  To what extent are management fees, or similar amounts, owed to the Debtor by Nourish and JumpHawk?  To what degree are transfers by the Debtor to corporate insiders, such as Nourish or JumpHawk, recoverable?  What about transactions with other entities?  *See, e.g.*, 341 Tr. at 43:10-15 (referring to payment of management fees by "Jopuma").

    56.    Finally, no "unusual circumstances" exist under section 1112(b)(2) which would otherwise weigh against dismissal or conversion.  First, the "unusual circumstances" exception to this Court's requirement to grant relief under section 1112(b)(1) upon a showing of cause does not apply where, as here, cause exists within the meaning of section 1112(b)(4)(A).  11 U.S.C. § 1112(b)(2)(B).  Second, no reasonable likelihood exists that the Debtor will confirm a plan in a reasonable time frame, as the Debtor is cash flow insolvent, Keswin will not consent to use of his cash collateral, and the Debtor cannot adequately protect him.

---

*Corp.*, 43 B.R. 293, 297-98 (Bankr. S.D.N.Y. 1984) ("It is a basic tenet of the Bankruptcy Code that [b]ankruptcy operates as the acceleration of the principal amount of all claims against the debtor … This tenet follows logically from the expansive Code definition of claim … and from the Code's provision in Section 502 that a claim will be allowed in bankruptcy regardless of its contingent or unmatured status").

## **CONCLUSION**

This case should be dismissed or converted pursuant to section 1112(b)(1).

Dated: March 4, 2016
      New York, New York

STORCH AMINI & MUNVES PC

/s/ Jeffrey Chubak
Bijan Amini
Avery Samet
Jeffrey Chubak
2 Grand Central Tower
140 E. 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100

*Attorneys for Lyrical Opportunity Partners, L.P.
and Jeffrey Keswin*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>FINGER LAKES CAPITAL PARTNERS, LLC,<br><br>              Debtor. | Chapter 11<br><br>Case No. 16-22112 (RDD) |

## ORDER DISMISSING CHAPTER 11 CASE

Upon the motion of Lyrical Opportunity Partners, L.P. and Jeffrey Keswin to dismiss, or alternatively, convert this chapter 11 case to one under chapter 7, pursuant to Bankruptcy Code section 1112(b)(1); and this Court having jurisdiction to consider the motion; and consideration of the motion being a core proceeding; and venue being proper in this district; and due and proper notice of the motion having been provided; and upon this Court's finding that cause exists to dismiss or convert this case, it is hereby ORDERED:

1.      The motion is granted.

2.      This case is hereby dismissed.

3.      This Court shall retain jurisdiction to hear and determine all matters relating to the implementation of this order.

4.      Notwithstanding any Bankruptcy Rule to the contrary, this order shall be effective immediately.

Dated: _____, 2016
      New York, New York

                              _____
                              Hon. Robert D. Drain
                              United States Bankruptcy Judge