# Exhibit 1

# EXHIBIT 1

## LLC Agreement

01:18449252.5

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## OF

## CAYUGA LAKE ACQUISITION, LLC
(A Delaware Limited Liability Company)

*Operating Agreement*
*of Cayuga Lake Acquisition, LLC –2013*

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS ................................................................................................ 1

ARTICLE II. FORMATION OF THE COMPANY ............................................................ 5

    SECTION 2.1.    Name and Formation ................................................................ 5
    SECTION 2.2.    Assumed Name ........................................................................ 5
    SECTION 2.3.    Registered Office and Registered Agent .................................. 5
    SECTION 2.4.    Term ........................................................................................ 5
    SECTION 2.5.    Purposes .................................................................................. 5
    SECTION 2.6.    Powers of the Company ........................................................... 6
    SECTION 2.7.    Admission of Members ............................................................ 6

ARTICLE III. Membership Interests and Capital ............................................................... 7

    SECTION 3.1.    Classes of Membership Interests .............................................. 7
    SECTION 3.2.    Capital of the Company ........................................................... 7
    SECTION 3.3.    Initial Capital Contributions .................................................... 7
    SECTION 3.4.    Additional Capital Contributions ............................................. 7
    SECTION 3.5.    Capital Accounts ..................................................................... 8
    SECTION 3.6.    Company Capital ..................................................................... 9
    SECTION 3.7.    Liability of Members and the Manager ..................................... 9
    SECTION 3.8.    Loans by Members or Affiliates ............................................. 10

ARTICLE IV. RIGHTS, POWERS AND DUTIES OF THE MANAGER ................................. 10

    SECTION 4.1.    Management of Company Business ....................................... 10
    SECTION 4.2.    Powers of the Manager ......................................................... 11
    SECTION 4.3.    Indemnification and Exculpation ........................................... 12
    SECTION 4.4.    Devotion of Time .................................................................. 14
    SECTION 4.5.    Rights of Competition ........................................................... 14
    SECTION 4.6.    Tax Matters Partner .............................................................. 14

ARTICLE V. MEETINGS OF MEMBERS; RIGHTS OF MEMBERS; RESTRICTIONS
        ON INTERESTS ..................................................................................... 15

    SECTION 5.1.    Place of Meetings ................................................................. 15
    SECTION 5.2.    Meetings of Members ............................................................ 15
    SECTION 5.3.    Notice of Meetings of Members ............................................. 15
    SECTION 5.4.    Quorum ................................................................................ 15
    SECTION 5.5.    Attendance and Waiver of Notice .......................................... 15
    SECTION 5.6.    Voting on Matters ................................................................. 15
    SECTION 5.7.    Registered Members .............................................................. 16
    SECTION 5.8.    Actions With or Without a Meeting and Telephone Meetings ............ 16
    SECTION 5.9.    Restrictions on Disposition .................................................... 16

i

ARTICLE VI. BOOKS AND RECORDS ..............................................................................17

    SECTION 6.1.   Books and Records .........................................................................17
    SECTION 6.2.   Accounting Basis for Tax Reporting Purposes; Fiscal Year ..............17
    SECTION 6.3.   Reports.........................................................................................18
    SECTION 6.4.   Returns and Other Elections ...........................................................18

ARTICLE VII. ALLOCATIONS AND DISTRIBUTIONS ....................................................18

    SECTION 7.1.   Distributions of Profits and Losses...................................................18
    SECTION 7.2.   Allocations of Net Profits and Net Losses.........................................18
    SECTION 7.3.   Limitations on Distributions............................................................18
    SECTION 7.4.   Member Acknowledgement .............................................................18
    SECTION 7.5.   Code Section 754 Election ..............................................................18

ARTICLE VIII. LIQUIDATION AND DISSOLUTION OF THE COMPANY ........................19

    SECTION 8.1.   Events of Dissolution......................................................................19
    SECTION 8.2.   Method of Liquidations ...................................................................19
    SECTION 8.3.   Date of Termination........................................................................20
    SECTION 8.4.   Waiver of Partition .........................................................................20
    SECTION 8.5.   Certificate of Cancellation...............................................................20

ARTICLE IX. MISCELLANEOUS.....................................................................................20

    SECTION 9.1.   Notice...........................................................................................20
    SECTION 9.2.   Application of Delaware Law............................................................20
    SECTION 9.3.   Jurisdiction and Venue ....................................................................20
    SECTION 9.4.   No State-Law Partnership.................................................................21
    SECTION 9.5.   Effect of Agreement .......................................................................21
    SECTION 9.6.   Entire Agreement............................................................................21
    SECTION 9.7.   Amendment ...................................................................................21
    SECTION 9.8.   Counterparts...................................................................................21
    SECTION 9.9.   Captions ........................................................................................21
    SECTION 9.10.  Severability ...................................................................................21
    SECTION 9.11.  Numbers and Gender ......................................................................21
    SECTION 9.12.  Additional Documents and Acts.......................................................21
    SECTION 9.13.  Confidentiality ...............................................................................21
    SECTION 9.14.  Creditors Not Benefited ..................................................................22
    SECTION 9.15.  Sections.........................................................................................23
    SECTION 9.16.  No Waiver......................................................................................23
    SECTION 9.17.  Remedies Not Exclusive..................................................................23
    SECTION 9.18.  Approvals.......................................................................................23

Exhibit A -- Members, Capital Contributions, Sharing Ratios, etc.
Exhibit B -- Distribution Waterfall
Exhibit C -- Form of Joiner Agreement

ii

# LIMITED LIABILITY
## COMPANY OPERATING AGREEMENT

### OF

## CAYUGA LAKE ACQUISITION, LLC

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT of CAYUGA LAKE ACQUISITION, LLC, a Delaware limited liability company, is hereby duly adopted, approved, ratified and confirmed by each of FINGER LAKES CAPITAL PARTNERS LLC, a Delaware limited liability company, and the individuals or entities who from time to time becomes party to this Agreement by execution of a signature page hereto (collectively, the "Members").

In consideration of the mutual promises made herein, the parties hereto, intending to be legally bound, hereby agree as follows:

### ARTICLE I.

### DEFINITIONS

The capitalized terms used but not otherwise defined in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Article I.

"Act" means the Delaware Limited Liability Company Act, 6 Del. C. §18-101, et seq., as amended from time to time, or any successor statute thereto.

"Additional Capital Contribution" means, with respect to any Member, any amount contributed or deemed to be contributed to the capital of the Company by such Member pursuant to Section 3.4 of this Agreement.

"Affiliate" means, with respect to any Member or Manager, any Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person to whom reference is made. The term "control" as used herein (including the terms "controlling," "controlled by," and "under common control with") means the possession, direct or indirect, of the power (a) to vote five percent (5%) or more of the outstanding voting securities of or voting interest in a Person, or (b) otherwise to direct the management policies of such Person by contract or otherwise.

"Agreement" means this Limited Liability Company Operating Agreement, including the schedules and exhibits hereto, as amended, supplemented or otherwise modified from time to time.

"Applicable Law" or "Law" means any laws, statutes, treaties, rules, codes, ordinances, regulations, certificates, orders, official interpretations, licenses and permits of any applicable Governmental Authority and any judgments, decrees, injunctions, writs, orders or like actions

of any court, arbitrator or other administrative, judicial or quasi-judicial tribunal or agency of competent jurisdiction.

"Book Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except that (a) the initial Book Value of any asset contributed by a Member to the Company shall be the fair market value of such asset, as agreed by the Members; (b) the Book Value of all Company assets shall be adjusted in the event of a revaluation as provided in Section 3.5(d); (c) the Book Value of any Company asset distributed to any Member shall be the fair market value of such asset on the date of distribution as agreed by the Members; and (d) such Book Value shall be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Capital Account" means, with respect to any Member, the account maintained for such Member in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).

"Capital Contributions" means, with respect to any Member, the total of all Capital contributions made by such Member to the Company pursuant to this Agreement, including, but not limited to, Initial Capital Contributions and Additional Capital Contributions.

"Certificate of Formation" means the certificate of formation of the Company filed with the Office of the Delaware Secretary of State on May 20, 2013 pursuant to the Act.

"Class A Sharing Ratio" means the Sharing Ratio of each Member holding Class A Membership Interests, as set forth opposite since Members name on Schedule A hereto.

"Class A Membership Interests" means the non-voting Class A Membership Interests of the Company as set forth in Section 3.1 of this Agreement.

"Class B Membership Interests" means the voting Class B Membership Interests of the Company as set forth in Section 3.1 of this Agreement.

"Class B Sharing Ratio" means the Sharing Ratio of each Member holding Class B Membership Interests, as set forth opposite since Members name on Schedule A hereto.

"Closing Date" means the date hereof.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, together with all rules and regulations promulgated thereunder and interpretations thereof by the Internal Revenue Service, or any successor federal statute.

"Closing Date" means the date hereof.

"Company" means Cayuga Lake Acquisition, LLC, a Delaware limited liability company.

"Depreciation" means, with respect to any asset for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to such asset for such Fiscal Year or other period, except that if the Book Value of an

asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period (as a result of property contributions or adjustments to such values), Depreciation shall be adjusted as necessary so as to be an amount which bears the same ratio to such asset's beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year or other period bears to such asset's beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction with respect to such asset for such Fiscal Year or other period is zero, Depreciation for such Fiscal Year or other period shall be determined with reference to such asset's beginning Book Value using any reasonable method selected by the Manager.

"Dispose of" or "Disposition" has the meaning assigned to it in Section 5.9(a) hereof.

"EBITDA" means, with respect to any Portfolio Company, its earnings before interest, taxes, depreciation and amortization, the components of which being calculated in accordance with GAAP on a basis consistent with such Portfolio Company's past practice.

"Family Member" has the meaning assigned to it in Section 5.9(b) hereof.

"Fiscal Quarter" means each fiscal quarter of the Company.

"Fiscal Year" means each fiscal year of the Company.

"Governmental Authority" means the government of any federal, state, municipal or other political subdivision, including all agencies and instrumentalities of such government or political subdivision.

"Hypothetical Liquidation Amount" shall mean, as to each Member, an amount equal to (a) the distributions that would be made to the Member if the Company were dissolved, its affairs wound up, and all of its other assets sold for cash equal to their respective fair market values, all Membership liabilities were satisfied (limited with respect to each nonrecourse liability to the fair market value of the assets securing the liability), and the net assets of the Membership were distributed in accordance with Section 8.2 to the Members immediately after making the allocation.

"Indemnitee" has the meaning assigned to it in Section 4.3(a) hereof.

"Information" has the meaning assigned to it Section 9.14.

"Initial Capital Contribution" means, as to any Member, any amount contributed to the capital of the Company by such Member pursuant to Section 3.3.

"Majority in Interest" means (i) with respect to a class of Membership Interests a combination of Members or a single Member having in the aggregate more than 50% of such class of Membership Interests in the Company, or (ii) with respect to all Membership Interests, a combination of Members or a single Member having in the aggregate more than 50% of all such Membership Interests in the Company (or in the aggregate more than 50% of the Overall Sharing Ratio).

"Manager" means the Person designated as the "manager" (within the meaning of the Act) of the Company from time to time pursuant to Section 4.1.

"Members" means the members of the Company as of the date hereof as described in the introductory paragraph of this Agreement and any Substituted Members, in each case so long as such Person shall hold any Membership Interest. The Members shall constitute the "members" (as that term is defined in the Act) of the Company.

"Membership Interest" means the entire limited liability company interest of a Member in the Company at any particular time, including, without limitation, the rights and obligations of such Member under this Agreement and the Act. There shall be two classes of Membership Interests: non-voting Class A Membership Interests and voting Class B Membership Interests.

"Overall Sharing Ratio" means with respect to any Member, the ratio of such Member's Capital Contribution(s) to the total Capital Contributions to the Company, regardless of Class of Interest, as adjusted from time to time pursuant to this Agreement.

"Person" or "person" means an individual, a corporation, a sole proprietorship, a general or limited partnership, a limited liability company or partnership, an association, a trust, a joint venture or any other entity or organization of any kind, including a Governmental Authority.

Portfolio Company(ies) shall mean any corporation, limited liability company or other business entity that the Company invests in or controls. The Portfolio Company that the Company will initially invest in is Nourish Snacks, Inc., a Delaware corporation.

"Profits" and "Losses" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b)    any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

(c)    gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from such Book Value; and

(d)   in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of "Depreciation" herein.

"Substituted Members" means Persons who have acquired Membership Interests from other Members, and who are identified on Schedule A attached hereto (as amended to reflect such acquisition) and who have become parties to this Agreement either by executing this Agreement or by entering into a joinder agreement satisfactory to the Manager.

"Treasury Regulation" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE II.

## FORMATION OF THE COMPANY

**SECTION 2.1.**      **Name and Formation.**   The name of the Company is Cayuga Lake Acquisition, LLC. The Certificate of Formation of the Company was filed on May 20, 2013 (the "Formation Date") by an authorized person, and the Company was formed pursuant to the Act. The rights and liabilities of the Members shall be as provided in the Act, except as otherwise set forth herein. In the event that any provision in this Agreement conflicts with the Act, such provision in this Agreement shall control and govern to the extent permitted by Applicable Law. The Members intend that the Company shall be (a) classified as a partnership for federal and state tax purposes and (b) subject to all federal tax laws governing partnership and limited liability companies. The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture for any purposes other than federal and state tax purposes, and this Agreement shall not be construed to suggest otherwise.

**SECTION 2.2.**      **Assumed Name.**   The Company shall do business under the name set forth in Section 2.1 or under any other name or names which the Manager shall deem advisable and in the best interests of the Company.

**SECTION 2.3.**      **Registered Office and Registered Agent.**   The address of the Company's registered office in the State of Delaware shall be c/o Corporation Service Company 2711 Centerville Rd., Ste. 400, in the city of Wilmington, County of New Castle, Delaware 19808.

**SECTION 2.4.**      **Term.**   The term of the Company commenced on the Formation Date and shall terminate 30 years from such date, unless sooner terminated in accordance with either the provisions of this Agreement or the Act or unless the same is extended for additional periods of five (5) years by the Manager.

**SECTION 2.5.**      **Purposes.**   The purposes and character of the business of the Company shall be to conduct the business of the Company and to conduct any and all other

activities for which limited liability companies may be organized under the Act, including, but not limited to:

(a)     acquiring shares of Series Seed Preferred Stock of Nourish Snacks, Inc., and exercising its rights as a shareholder thereof; and

(b)     managing and otherwise realizing upon the value of the Company's equity interest in Nourish Snacks, Inc. through distributions or the ultimate sale or disposition of its interests therein.

**SECTION 2.6.**     **Powers of the Company**.   In furtherance of the purposes and business of the Company, but subject to Section 5.6 hereof, the Company shall have the power:

(a)     to purchase or acquire stock or other equity interests in any Portfolio Company, including, but not limited to Nourish Snacks, Inc.;

(b)     to hold legal title to any Company property in the name of the Company or a nominee designated by the Manager;

(c)     to enter into, perform and carry out contracts and agreements incidental to the purposes of the Company;

(d)     to acquire property incidental to the purposes of the Company;

(e)     to borrow money and incur indebtedness, to issue evidences of indebtedness in connection therewith, and to secure the same by guaranty, letter of credit, mortgage, deed of trust, pledge, security agreement, assignment or any other lien or encumbrance (or any combination thereof), and to refinance such borrowings and indebtedness from time to time as any of the above relate to the purposes of the Company; and

(f)     to take any action or carry on any other activity necessary or desirable in the discretion of the Manager or the requisite Members to carry out the purposes and business of the Company, to the extent the same may be legally exercised by limited liability companies under the Act.  The Company shall carry out the foregoing activities pursuant to the arrangements set forth in this Agreement.

**SECTION 2.7.**     **Admission of Members**.   Upon the execution of this Agreement or a counterpart of this Agreement, each of the parties hereto (other than the Company) shall be admitted to the Company as a Member.  Except as otherwise provided in this Agreement, the admission of any additional Member shall require the unanimous written consent of the then existing Members.

# ARTICLE III.

## MEMBERSHIP INTERESTS AND CAPITAL

**SECTION 3.1.**     <u>Classes of Membership Interests.</u>

(a)     The interests of the Members in the Company shall be divided into the following two classes of interests: (i) Class A Membership Interests and (ii) Class B Membership Interests. The class of Membership Interest of each Member shall be set forth opposite such Member's name on <u>Exhibit A</u> hereto.

(b)     The Member or Members holding the Class B Membership Interests shall be entitled to vote on all matters submitted to a vote of the Members as provided in Section 5.6.

(c)     Except as expressly otherwise provided in this Agreement or required under the Act, the Member or Members holding the Class A Membership Interests shall have no voting rights.

**SECTION 3.2.**     <u>Capital of the Company.</u> The capital of the Company shall be the aggregate amount of cash and property contributed to the Company in the manner hereinafter set forth in this Article III.

**SECTION 3.3.**     <u>Initial Capital Contributions.</u>     Upon execution of this Agreement, each Member shall contribute as capital to the Company, in immediately available funds, the amount set forth opposite its name under the heading "Initial Capital Contribution" on <u>Exhibit A</u> hereto. Each such contribution made by a Member pursuant to this Section 3.3 shall be the Initial Capital Contribution of such Member and, upon making such contribution in the amount set forth opposite its name under the heading "Initial Capital Contribution" on <u>Exhibit</u> A hereto, such Member shall receive such Member's Class A Sharing Ratio and/or Class B Sharing Ratio, as applicable.

**SECTION 3.4.**     <u>Additional Capital Contributions.</u>     In addition to the Initial Capital Contributions, the Members holding Class B Membership Interests, by unanimous written consent, may determine from time to time that additional capital contributions are needed to enable the Company to conduct its business. Upon such Class B Members' making of such a determination, the Company shall give notice to all Members in writing at least ten (10) business days prior to the date on which such contribution is due, such notice shall set forth the amount of additional contributions needed, the purpose for which the contributions are needed, and the date by which the Members may contribute. Each Member shall be entitled to contribute a proportionate share of such additional contributions, in accordance with its Class B and/or Class A Sharing Ratio, respectively. No Member shall be obligated to make any such additional contributions. In the event any one or more Members do not make their additional contributions, the other Members shall be given the opportunity to make the contributions. Any additional contributions by a Member pursuant to this Section 3.4 shall be credited to such Member's Capital Account in accordance with <u>Section 3.5(b)</u>.

**SECTION 3.5.**      **Capital Accounts.**

(a)      A Capital Account shall be established and maintained by the Company for each Member in accordance with this Section 3.5.

(b)      Each Member's Capital Account shall be credited with (i) the amount of the Initial Capital Contribution made by such Member pursuant to Section 3.3 hereof, (ii) the amount of any Additional Capital Contribution, (iii) such Member's allocable share of Profits, income and gain in accordance with Article VII and (iv) the amount of any Company liabilities that are expressly assumed by such Member or that are secured by any Company property distributed to such Member.

(c)      A Member's Capital Account shall be debited by (i) the amount of cash and the Book Value of any Company property distributed to such Member pursuant to any provision of this Agreement, (ii) such Member's allocable share of Losses, deductions and other losses in accordance with Article VII and (iii) the amount of any liabilities of such Member that are expressly assumed by the Company or that are secured by any property contributed by such Member to the Company.

(d)      Upon the occurrence of certain events described in Treasury Regulations Sections 1.704-1(b)(2)(iv)(f), 1.704-1(b)(4) and 1.704-2, the Manager shall increase or decrease the Capital Accounts of the Members to reflect a revaluation of Company property on the Company's books to its fair market value (as determined by all the Members holding Class B Membership Interests and taking into account Section 7701(g) of the Code).

(e)      The Capital Account of each Member shall be determined after giving effect to all transactions which have been effected prior to the time when such determination is made giving rise to the allocation of income, gain, Profits, Losses, deductions and other expenses and to all contributions and distributions theretofore made to or by the Company. Any person who acquires a Membership Interest directly from a Member shall have a Capital Account which includes the Capital Account balance attributable the amount of the Membership Interest so acquired or transferred.

(f)      In the event that any Member makes a loan to the Company, such loan shall not be considered a contribution to the capital of the Company and shall not increase the Capital Account of the lending Member. Repayment of such loans shall not be deemed withdrawals from the capital of the Company and shall not decrease the Capital Account of the Member being repaid.

(g)      Any fees, interest or similar compensation payable to a Member pursuant to this Agreement shall be deemed a guaranteed payment for federal income tax purposes and not a distribution to such Member for such purposes. Such payments to a Member shall not reduce the Capital Account of such Member, except to the extent of its distributive share of any Company Losses or other downward capital adjustment resulting from such payment.

(h)     From time to time the Manager may make such modifications to the manner in which the Capital Accounts are computed as it deems necessary or advisable to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2 provided that such modification is not likely to have a material effect on the amounts distributable to any Member pursuant to this Agreement.

(i)     The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2, and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

(j)     No Member with a deficit balance in its Capital Account shall have any obligation to the Company or any other Member to restore such deficit balance.  In addition, no venturer, partner or shareholder in any Member shall have any liability to the Company or any other Member for any deficit balance in such venturer's, partner's or shareholder's capital account in the Member in which it is a partner, venturer or shareholder.  Furthermore, a deficit Capital Account balance of a Member (or a deficit capital account balance of a partner, venturer or shareholder in a Member) shall not be deemed to be a Company asset or Company property.

**SECTION 3.6.**     **Company Capital.**

(a)     Except as may be otherwise specifically provided in this Agreement, no Member shall be paid interest on any Capital Contribution to the Company.

(b)     No Member shall have the right to withdraw all or any part of its Capital Contributions or to receive any return on any portion of its Capital Contributions, except as may be otherwise specifically provided in this Agreement.

(c)     Under the circumstances involving a return of any Capital Contribution, no Member shall have the right to receive property other than cash.

**SECTION 3.7.**     **Liability of Members and the Manager.**

(a)     Except as otherwise required by any non-waivable provision of the Act or of any other Applicable Law: (i) no Member or Manager shall be personally liable in any manner whatsoever for any debt, liability or other obligation of the Company, whether such debt, liability or other obligation arises in contract, tort, or otherwise; and (ii) no Member shall in any event have any liability whatsoever in excess of, without duplication, (w) the amount of its required (but unpaid) Capital Contributions under Sections 3.3 and 3.4, (x) its share of any assets and undistributed profits of the Company, (y) the amount of any unconditional obligation of such Member to make additional Capital Contributions to the Company pursuant to this Agreement, and (z) the amount of any wrongful distribution to such Member, if, and only to the extent, such Member has actual knowledge (at the time of the distribution) that such distribution is made in violation of Section 18-607 of the Act.

(b)    Neither any Member nor the Manager shall be required to contribute to the capital of, or loan any funds to, the Company other than as expressly required in this Agreement.

(c)    The Manager shall not be liable for the return of all or any portion of the Capital Contributions of any Member.

(d)    Except as otherwise expressly provided herein, no Member shall have any priority over any other Member as to the return of its Capital Contributions or as to compensation by way of income.

SECTION 3.8.    **Loans by Members or Affiliates**.    Subject to obtaining any approvals required under this Agreement for the Company to borrow funds, any Member or its Affiliate may (but shall not be obligated to) at any time, upon obtaining the consent of the Manager, loan money or guarantee a loan to the Company to finance Company operations, to finance or refinance any assets of the Company, to pay the debts and obligations of the Company, or for any other Company purpose. If any Member or its Affiliate lends funds or guarantees a loan of funds to the Company, such Member or Affiliate shall be entitled to receive interest on such loan or a fee for guaranteeing any such loan, at an interest rate equal to at least two percent (2%) over and above the "prime rate" or "base rate" of Citibank, N.A., or any successor thereof, changing as and when such "prime rate" or "base rate" shall change, provided that in no event shall the interest rate exceed the maximum interest rate permitted by law, or at such other interest rate or fee as may be agreed upon by all Members.

## ARTICLE IV.

## RIGHTS, POWERS AND DUTIES OF THE MANAGER

SECTION 4.1.    **Management of Company Business.**

(a)    The Members agree that the "Manager" of the Company (within the meaning of the Act) shall initially be Finger Lakes Capital Partners LLC ("Finger Lakes"). A Majority In Interest of the Members holding Class B Membership Interests shall at all times from and after the date hereof have the right to designate, remove and redesignate the Manager; provided, however that in the event that (i) either of Gregory Shalov or Zubin Mehta is no longer a manager of the Manager (or are unable to perform their duties as such due to death or disability) or (ii) a Cause Event (as defined below) has occurred, a Majority in Interest of the Members holding Class A Membership Interests shall then have the right to designate, remove and redesignate the Manager. As used in this Agreement "Cause Event" means, with respect to Finger Lakes, Gregory Shalov or Zubin Mehta: (a) a conviction or admission by consent of guilt in respect of a material violation of a U.S. federal or state securities law which violation has a material adverse impact on the Company, or in respect of any felony involving moral turpitude, (b) a material breach of this Agreement (following written notice and a reasonable opportunity to cure) or (c) the entry of a final judgment by a court of competent jurisdiction finding that Finger Lakes, Gregory Shalov or Zubin Mehta has committed

in respect of the Company an act or omission of a material nature involving bad faith, willful misconduct or fraud.

(b)    Whenever any Manager vacancy (whether occurring by reason of resignation, removal or otherwise) is to be filled, a Majority in Interest of the Members holding Class B Membership Interests shall be entitled to designate a successor Manager to fill such vacancy (unless the proviso in clause (a) above applies, in which case the holders of Class A Membership Interests will fill such vacancy).

(c)    Class A Membership Interests shall have full voting power on a per Membership Interest basis on all matters of the Company on par with Class B Membership Interests under this Agreement upon the occurrence of any of the following events: at such time as either Gregory Shalov or Zubin Mehta deliver to the Members a Dispute Notice (as defined herein). In the event that Class A Membership Interests are given full voting rights in accordance with this Section 4.1(c), all references in this Agreement to the rights of holders of Class B Membership Interests for all purposes shall apply to holders of Class A Membership Interests.

(d)    So long as Finger Lakes Capital Partners LLC is Manager of the Company, it shall provide a notice (a "Dispute Notice") to the Members of any dispute between Gregory Shalov or Zubin Mehta relating to the Company. Such Dispute Notice shall be delivered to the Members no later than 2 days after the existence of such dispute.

SECTION 4.2.    Powers of the Manager. To the fullest extent permitted by the Act and this Agreement, and except as otherwise provided in Section 5.6(b) and consistent with the stated purposes of the Company, the Manager shall have the right, power, authority and obligation to manage, control, administer and operate the business and affairs of the Company in accordance with this Agreement, and shall have the right, power and authority to make the following decisions on behalf of the Company in accordance with this Agreement and the Act:

(a)    to supervise or arrange for the supervision of day-to-day operations of the Company;

(b)    to enter into, perform and carry out contracts and agreements in the ordinary course of the Company's business, including all rights and obligations with respect to the Company's ownership and/or equity interests in the assets and the business of its Portfolio Companies;

(c)    to collect all payments due and owing to the Company and to distribute such payments;

(d)    to incur and pay trade payables and other debts, expenses and obligations of the Company in the ordinary course of the Company's business;

(e)    to borrow money on behalf of the Company and to renew, extend, modify, rearrange, increase or refinance Company borrowings from time to time;

(f)    to acquire, lease, develop, hold, sell or improve any personal property or any interest therein on behalf of the Company;

(g)    to execute and deliver such documents on behalf of the Company as the Manager may deem necessary, desirable, convenient or incidental for the Company's purposes and business;

(h)    to perform, or cause to be performed, all of the Company's obligations and to exercise or cause to be exercised all of the Company's rights under any agreement to which the Company or any nominee of the Company is a party, except to the extent such obligations may be inconsistent with other obligations of the Manager under this Agreement;

(i)    to hire and terminate attorneys, consultants, accountants or other independent contractors on behalf of the Company, to the extent that such professional services are required, in the Manager's judgment, during the term of the Company;

(j)    to institute, prosecute, defend and settle any legal, arbitration or administrative actions or proceedings on behalf of or against the Company;

(k)    to pay all taxes, assessments, rents and other impositions applicable to Company assets and undertake, when appropriate in its judgment, any action or proceeding seeking to reduce such taxes, assessments, rents or other imposition;

(l)    to determine the timing and amount of distributions pursuant to Article VII hereof and proceeds of liquidation, all in accordance with the terms of this Agreement;

(m)    to open and maintain bank accounts for the deposit of Company funds, with withdrawals to be made upon such signature or signatures as the Manager may designate;

(n)    to cause all Company activities to be performed in accordance with Applicable Law;

(o)    to make such elections as, in the Manager's judgment, are necessary or desirable pursuant to the Code and applicable Treasury Regulations; and

(p)    to do any act which is necessary, desirable, convenient or incidental to conduct the business and affairs of the Company.

**SECTION 4.3.    Indemnification and Exculpation.**

(a)    To the fullest extent allowed by the Act and by other Applicable Law, the Company shall indemnify, defend against and hold harmless the Manager, in its capacity as manager of the Company, each Member, and the Manager's and each such Member's Affiliates (and the Manager's, such Member's and such Affiliate's successors, assigns, directors, managers, officers, employees, agents, representatives,

16-22112-rdd   Doc 28-2   Filed 03/23/16   Entered 03/23/16 15:56:21   Exhibit 1 LLC
Operating Agreement   Pg 18 of 33

parent corporations, subsidiary corporations, partners, members and Affiliates) (which Affiliates, for purposes of this Section 4.3(a), shall not include the Company) (each, each, an "Indemnitee") from, any expenses (including reasonable attorneys' fees and court costs), liabilities, claims, causes of action, losses or damages actually incurred by any such Indemnitee in connection with (i) any proceeding to which such Indemnitee is made a party or which such Indemnitee otherwise becomes involved in because such Indemnitee is or was a Manager or a Member of the Company, or (ii) any act or omission performed or omitted by such Indemnitee in good faith in a manner it believed to be in, or not contrary to, the best interests of the Company. The Company shall not be required to indemnify any Indemnitee for any costs, liabilities, claims, causes of action, losses or damages under this Section 4.3(a) to the extent the same arise from such Indemnitee's gross negligence or willful misconduct. The termination of an action, suit or proceeding by judgment, order or settlement, or upon a plea of nolo contenders or its equivalent, shall not, in and of itself, create a presumption or otherwise constitute evidence that an Indemnitee acted in a manner that would render it ineligible for indemnification under this Section 4.3(a). The satisfaction of any indemnification obligation under this Section 4.3(a) shall be from and limited to Company assets, including insurance proceeds, if any, and neither any Member nor any Manager shall have any personal liability on account thereof. In no event may any Manager or Member subject any other Manager or Member to personal liability by reason of this indemnification provision.

(b)     Expenses incurred by an Indemnitee in defending any claim, demand, cause of action, suit or proceeding subject to this Section 4.3 shall be advanced by the Company prior to the final disposition of such claim, demand, cause of action, suit, or proceeding upon receipt by the Company of a written commitment by or on behalf of the Indemnitee to repay such amount if it shall be determined that such Indemnitee is not entitled to be indemnified under this Section 4.3.

(c)     For purposes of this Section 4.3, an Indemnitee may rely and shall incur no liability in acting or refraining from acting upon (i) any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, paper, document, signature or writing reasonably believed by it to be genuine, (ii) a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge, and (iii) an opinion of counsel selected by such Indemnitee with respect to legal matters, unless such acts are in bad faith.

(d)     Neither the Manager nor any of its Affiliates nor any of the Manager's or such Affiliate's successors, assigns, directors, managers, officers, employees, agents, representatives, parent corporation, subsidiary corporations, partners, members or Affiliates shall be liable to the Company or to a Member for any losses sustained or liabilities incurred as a result of any act or omission of the Manager or any such other Person if the act or failure to act of the Manager or such other Person (i) did not constitute gross negligence or willful misconduct and (ii) was taken in good faith in a manner it believed to be in, or not contrary to, the best interest of the Company.

BN\926610.3

**SECTION 4.4.**       **Devotion of Time**

The Manager shall devote such time, services and efforts as may be reasonably necessary for the proper furtherance, management, operation, maintenance and care of the Company's business as contemplated by this Agreement.

**SECTION 4.5.**       **Rights of Competition.**

(a)       Except as provided in Section 4.5(b), each Member and each Manager, their respective principals and Affiliates, and each such Affiliate's officers, employees, agents and representatives, shall be free to engage in, conduct or participate in any business or activity whatsoever, without any accountability, liability, or obligation whatsoever to the Company or to any other Member or Manager. Any competing business or activity of a Member, a Manager or any such other Person may be undertaken with or without notice to or participation therein by any other Member or Manager. Each Member, each Manager and the Company hereby waives any right or claim it may have against any Member or Manager with respect to any such competing business or activity or the income or profits therefrom.

(b)       Finger Lakes Capital Partners LLC agrees that so long as it is a Member of the Company and for a period twelve months after ceasing to be a Member of the Company, neither Gregory Shalov nor Zubin Mehta will (i) engage in duties or provide services to a Competitor which are substantially similar to those that they provide to the Company or Nourish Snacks, Inc., in any capacity, or (ii) own more than a 5% ownership interest in any such Competitor. The term "Competitor" means another business primarily engaged in creating, designing, marketing and monetizing methods to develop, distribute and sell a health or health-oriented snack product.

**SECTION 4.6.**       **Tax Matters Partner.** The Manager shall be designated the Company's "tax matters partner" under Section 6231 of the Code and is authorized to take such actions and to execute and file such statements and forms on behalf of the Company as are permitted or required by applicable provisions of the Code or Treasury Regulations issued thereunder, and the Members will take all other action that may be necessary or appropriate to effect such designation. All expenses incurred by the tax matters partner shall be expenses of the Company and shall be paid or reimbursed to the tax matters partner from Company funds. The tax matters partner shall prepare and timely file all federal, state and local income and other tax returns and reports as may be required as a result of the business of the Company. The tax matters partner shall promptly notify the Members if any tax return or report of the Company is to be audited or if any adjustments thereto have been proposed by any governmental body. In the event of an audit of the Company's federal income tax returns by the Internal Revenue Service, the tax matters partner shall be Finger Lakes Capital Partners LLC, who may, at the expense of the Company, retain accountants and other professionals to participate in the audit. In addition, the tax matters partner shall furnish to the Members all notices concerning administrative or judicial proceedings relating to federal income tax matters as required under the Code. During the pendency of any such administrative or judicial proceeding, the tax matters partner shall furnish to the Members periodic reports, not less often than quarterly, concerning the status of any such proceeding.

## ARTICLE V.

## MEETINGS OF MEMBERS; RIGHTS OF MEMBERS; RESTRICTIONS ON INTERESTS

**SECTION 5.1.**    **Place of Meetings.**  All meetings of the Members shall be held at such place within or without the State of Delaware as may be determined by the Manager and set forth in the respective notice or waivers of notice of such meeting.

**SECTION 5.2.**    **Meetings of Members.**  Meetings of the Members may be called by any Member or the Manager.

**SECTION 5.3.**    **Notice of Meetings of Members.**  Written or printed notice stating the place, day and hour of any meeting of Members shall be delivered not less than five (5) nor more than sixty (60) days before the date of the meeting, either personally or by mail, by or at the direction of the Manager or Member calling the meeting, to each Member of record.

**SECTION 5.4.**    **Quorum.**  A Majority in Interest of the Members of the Members holding Class B Membership Interests shall constitute a quorum at all meetings of the Members, except as otherwise provided by Law.  Once a quorum is present at the meeting of the Members, the subsequent withdrawal from the meeting of any Member prior to adjournment or the refusal of any Member to vote shall not affect the presence of a quorum at the meeting.  If, however, such quorum shall not be present at any meeting of the Members, the Members entitled to vote at such meeting shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a Majority in Interest of the Members holding Class B Membership Interests shall be present or represented.

**SECTION 5.5.**    **Attendance and Waiver of Notice.**  Attendance of a Member at any meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the sole purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.  Neither the business to be transacted at nor the purpose of any regular or special meeting of the Members need be specified in the notice or waiver of notice of such meeting.

**SECTION 5.6.**    **Voting on Matters.**

(a)    Except to the extent otherwise provided in this Agreement or by Applicable Law, at any meeting of the Members at which a quorum is present, the vote of a majority of the Class B Membership Interests represented at such meeting shall be the act of the Members, unless the vote of a greater number is required by this Agreement or by law.

(b)    The following actions shall not be taken, approved or effective unless such actions are approved by a vote of a Majority in Interest of the Members holding Class B Membership Interests:

(i)    the sale, exchange, lease or other transfer of all or materially all of the assets of the Company;

(ii)    any liquidation or dissolution of the Company, or any merger or consolidation involving the Company, or the making of any agreement to do so;

(iii)    the commencement of any bankruptcy, insolvency or reorganization proceeding with respect to the Company or the making of any assignment for the benefit of creditors of the Company; and

(iv)    except as otherwise provided in this Agreement, the admission of an additional Member or Substituted Member in the Company.

(c)    The following actions shall not be taken, approved or effective unless such actions are approved by a vote of a Majority in Interest of the Members holding Class A Membership Interests:

(i)    do any act in contravention of this Agreement;

(ii)    do any act which would make it impossible to carry on the ordinary business of the Company, except (A) as otherwise provided in this Agreement, or (B) pursuant to the exercise of the Company's rights under any applicable bankruptcy, insolvency, debtor protection or similar law;

(iii)    amend this Agreement or the Certificate of Formation;

(iv)    issue Membership Interests, securities, rights, options or warrants

**SECTION 5.7.**    **Registered Members**.    The Company shall be entitled to treat the holder of record of any Membership Interest as the holder in fact of such Membership Interest for all purposes, and accordingly shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person, whether or not it shall have express or other notice of such claim or interest, except as expressly required by this Agreement or the laws of the State of Delaware.

**SECTION 5.8.**    **Actions With or Without a Meeting and Telephone Meetings**. Notwithstanding any provision contained in this Article V, all actions of the Members provided for herein shall be taken either at a meeting and evidenced by written minutes thereof executed by an authorized Member or a Manager or by written consent without a meeting. Any meeting of the Members may be held by means of a telephone conference. Any action which may be taken by the Members without a meeting shall be effective only if the written consent (or consents) sets forth the action so taken, and is signed by Members having the required percentage of Membership Interests.

**SECTION 5.9.**    **Restrictions on Disposition.**

(a)    Restrictions on Disposition.    Except as expressly provided in Sections 5.9(b) hereof or on the unanimous written consent of all the Members of the Company,

Members of the Company may not, directly or indirectly, voluntarily or involuntarily, sell, transfer, negotiate, pledge, assign or otherwise dispose of (collectively, "Dispose of" or a "Disposition") any Membership Interests now owned or hereafter acquired by him or it or any part thereof either during such Member's corporate or other existence or lifetime, as the case may be, or upon its dissolution or liquidation or his death, as the case may be.

(b)    Exceptions to Restrictions on Disposition. The restrictions set forth in Sections 5.9(a) hereof shall not apply to any of the following Dispositions: (i) any repurchase or redemption by the Company from a Member of any Membership Interests, provided such repurchase or redemption is effectuated in accordance with the terms of the Act and this Agreement; (ii) in the case of a Member who is a natural person, to such Member's spouse, children, sisters or brothers (collectively, "Family Members" and, individually, a "Family Member") or to any trust primarily for the benefit of such Member and his Family Members; (iii) in the case of a Member who is not a natural person, to any other Member or to any partner, member, parent, subsidiary or Affiliate of such Member; provided, that the transferee shall have entered into a Joinder Agreement in substantially the form attached hereto as Exhibit C; and providing, further, that all Membership Interests, so transferred shall continue to be subject to all provisions of this Agreement as if such Membership Interests were still held by such Member.

## ARTICLE VI.

## BOOKS AND RECORDS

SECTION 6.1.    Books and Records. At all times during the existence of the Company, the Manager shall keep or cause to be kept at the Company's principal office true and complete books of account in accordance with generally accepted accounting principles, including: (a) a current list of the full name and business address of each Member; (b) a copy of the Certificate of Formation and all certificates of amendment thereto; (c) copies of the Company's federal, state and local income tax returns and reports; (d) copies of this Agreement and any financial statements of the Company for the three most recent years; and (e) all documents and information required to be kept by the Company under the Act. The Manager shall at all times maintain such books and records separate and apart from the records of the Manager. Such books and records shall be available for examination at such office by any Member or its duly authorized representatives during regular business hours for any purpose reasonably related to the Member's interest as a member of the Company. Any Member, at its own expense, may cause an audit of the books and records of the Company during regular business hours and shall furnish a written report thereof to the other Members.

SECTION 6.2.    Accounting Basis for Tax Reporting Purposes; Fiscal Year. The books and records of the Company shall be kept on the accrual method of reporting for tax and financial reporting purposes. The Fiscal Year of the Company shall be the calendar year, ending December 31.

**SECTION 6.3.**        **Reports.**

(a)        Within one hundred twenty (120) days after the end of each Fiscal Quarter, the Manager shall cause the Company to send to each Member unaudited financial statements (including a balance sheet and profit and loss statement) for the Fiscal Quarter then ended.

(b)        As soon as practicable after the end of each Fiscal Year, the Manager shall cause the Company to send to each Member a copy of each federal and, if applicable, state income tax return of the Company for the Fiscal Year then ended, together with such other tax information as shall be reasonably necessary for the preparation by each Member of its federal and state income tax return.

**SECTION 6.4.**        **Returns and Other Elections.**    The tax matters partner (as designated pursuant to Section 4.6 hereof) shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. All elections permitted to be made by the Company under federal or state tax laws shall be made by the tax matters partner.

## ARTICLE VII.

## ALLOCATIONS AND DISTRIBUTIONS

**SECTION 7.1.**        **Distributions of Profits and Losses.**    Distributions of available cash of the Company shall be made to the Members as set forth on Exhibit B hereto.

**SECTION 7.2.**        **Allocations of Net Profits and Net Losses.**    The items of Net Profit and Net Loss of the Membership for each fiscal year or other relevant fiscal period (including, without limitation, each period ending immediately prior to a distribution shall be allocated among the Members in accordance with each Member's economic interest in the respective item, as determined by the Manager pursuant to Sections 704(b) and 704(c) of the Code and related Treasury Regulations, so that the balance in the Member's Capital Account immediately after making all allocations required for the relevant fiscal period is, as nearly as possible, equal (proportionately) to the Member's Hypothetical Liquidation Amount.

**SECTION 7.3.**        **Limitations on Distributions.**    Notwithstanding any provision to the contrary contained in this Agreement, no distribution shall be declared and paid unless, after the distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members on account of their Capital Accounts.

**SECTION 7.4.**        **Member Acknowledgement.**    The Members agree to be bound by the provisions of this Article VII in reporting their shares of Company income and loss for income tax purposes.

**SECTION 7.5.**        **Code Section 754 Election.**    Upon the request of the tax matters partner, the Company shall make the election provided by Code Section 754.

## ARTICLE VIII.

## LIQUIDATION AND DISSOLUTION OF THE COMPANY

**SECTION 8.1.**    **Events of Dissolution**.  The Company shall be dissolved upon the happening of any of the following events:

(a)    when the period fixed for its duration in this Agreement has expired;

(b)    upon the unanimous written agreement of all of the Members holding Class B Membership Interests;

(c)    upon the occurrence of an event as set forth in Section 18-801(4) of the Act unless the remaining Members holding Class B Membership Interests, within ninety days after the occurrence of such event, unanimously elect to continue the business of the Company pursuant to the terms of this Agreement and to appoint, if necessary or desired, effective as of the date of such event, one or more additional members of the Company;

(d)    the entry of a judgment, order or decree of a court of competent jurisdiction adjudicating the Company to be a bankrupt, and the expiration without appeal of the period, if any, allowed by Applicable Law in which to appeal therefrom; or

(e)    the entry of a decree of judicial dissolution under Section 18-802 of the Act.

**SECTION 8.2.**    **Method of Liquidations**.  Upon the happening of any event specified in Section 8.1, with respect to which the Company is not continued and its business and affairs are discontinued, the Manager shall immediately commence to wind up the Company's affairs and shall liquidate the assets of the Company as promptly as possible, unless the Manager, or other liquidator, as the case may be, shall determine that an immediate sale of Company assets would cause undue loss to the Company, in which event (i) the liquidation may be deferred for a reasonable time, and/or (ii) all or part of the Company's assets may be distributed in kind.  Members shall continue to share distributions and Profits and Losses during the period of liquidation in the same proportions as before dissolution.  During the liquidation period, the Manager shall have the right to continue to operate and otherwise deal with Company property to the same extent the Manager has such right before the dissolution of the Company.  The proceeds from liquidation of the Company, including repayment of any debts of Members owed to the Company, shall be applied in the order of priority as follows:

(a)    to repayment of creditors of the Company, including the Manager and Members if they are creditors to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for Payment thereof), other than liabilities for which reasonable provision for payment has been made and liabilities for distributions to Members and former Members under Section 18-601 or 18-604 of the Act; and then

(b)    to the repayment of any unpaid Company debts or obligations, other than the Capital Accounts, to any Manager or Member; and then

(c)    to payment to the Members of the remaining credit balances in their respective Capital Accounts in proportion to the amounts in such accounts, after giving effect to all contributions, distributions, and allocations for all periods. Any such distribution to a Member in liquidation of the Company shall be made by the later of the end of the taxable year in which the liquidation occurs or ninety (90) days after the date of such liquidation.

**SECTION 8.3.    Date of Termination.** The Company shall be terminated when all the cash or property available for application and distribution under Section 8.2 shall have been applied and distributed in accordance therewith and a Certificate of Cancellation shall have been filed pursuant to Section 8.5.

**SECTION 8.4.    Waiver of Partition.** Each Member hereby irrevocably waives any right or power it may possess to compel a partition or sale of any asset of the Company or to compel a dissolution of the Company other than as expressly set forth in this Agreement.

**SECTION 8.5.    Certificate of Cancellation.** Upon the dissolution and the completion of the winding up of the Company, the Manager shall cause to be filed with the Office of the Secretary of State of the State of Delaware a Certificate of Cancellation, pursuant to the requirements of the Act, canceling the Certificate of Formation.

## ARTICLE IX.

### MISCELLANEOUS

**SECTION 9.1.    Notice.** Any notice required under this Agreement shall be in writing and shall be given to each Member at the address set forth for such Member on Schedule A hereto or at such other address as such Member may hereafter specify in writing. Such notices may be delivered by hand, or by telegram or telecopy, or may be mailed, postage prepaid, by certified or registered mail, by a deposit in a depository for the receipt of mail regularly maintained by the United States Postal Service. All notices which are hand delivered or given by telegram or telecopy shall be deemed given on the date of delivery. All notices which are mailed in the manner provided above shall be deemed to have been received by the addressee three (3) days after being mailed.

**SECTION 9.2.    Application of Delaware Law.** This Agreement and the application or interpretation hereof shall be governed exclusively by the laws of the State of Delaware, and specifically the Act, without regard to principles of conflict of laws.

**SECTION 9.3.    Jurisdiction and Venue.** Any process against any Member or the Manager in, or in connection with, any suit, action or proceeding arising out of or relating to this Agreement or any Member's or the Manager's performance hereof may be served personally by serving such Member's or the Manager's registered agent or, to the extent permitted by law, by certified mail at the address set forth in Schedule A hereto with the same effect as though served on such Member or the Manager personally. The Members and the

Manager hereby irrevocably submit in any suit, action nor proceeding arising out of or relating to this Agreement or any Member's or the Manager's performance hereof to the jurisdiction of the Delaware Court of Chancery and waive any and all objections to jurisdiction that such Member or the Manager may have under the laws of the State of Delaware or the United States.

SECTION 9.4.   **No State-Law Partnership.**   The Members intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture by reason of this Agreement, and that neither any Member nor any Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.

SECTION 9.5.   **Effect of Agreement.**   This Agreement shall be binding upon all Members, their respective assigns and respective spouses, heirs, successors, executors and administrators, if applicable.

SECTION 9.6.   **Entire Agreement.**   This Agreement and the schedules and exhibits hereto, if any, contain all of the understandings and agreements of whatsoever kind and nature existing between the Members with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, whether written or oral, with respect thereto.

SECTION 9.7.   **Amendment.**   Except as otherwise expressly set forth in this Agreement, this Agreement may be amended, supplemented or restated only by a written agreement executed by each of the Members.

SECTION 9.8.   **Counterparts.**   This Agreement may be executed in counterparts, each of which shall be deemed to be an original and shall be binding upon the Member who executed the same, but all of such counterparts shall constitute one and the same agreement.

SECTION 9.9.   **Captions.**   The title and captions contained herein are for convenience only and shall not be deemed part of the context of this Agreement.

SECTION 9.10.   **Severability.** Every provision hereof is intended to be severable, and if any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the reminder of this Agreement and that provision shall be deemed modified to a provision which constitutes that provision which, although not illegal or invalid, is closest to the intent of the original provision.

SECTION 9.11.   **Numbers and Gender.**   Where the context so indicates, the masculine shall include feminine and neuter, and the singular shall include the plural.

SECTION 9.12.   **Additional Documents and Acts.**   In connection with this Agreement, as well as all transactions contemplated by this Agreement, the Members agree to execute such additional documents and papers, and to perform and do such additional acts, as may be necessary and proper to effectuate and carry out all of the provisions of this Agreement.

SECTION 9.13.   **Confidentiality.**   The terms of this Agreement, the identity of any person with whom the Company may be holding discussions with respect to any

investment, acquisition or other transaction or in whom the Company may invest directly or indirectly, and all other business, financial or other information relating directly to the conduct of the business and affairs of the Company and/or its Portfolio Companies or the relative or absolute rights or interests of any of the Members (collectively, the "Information") that has not been publicly disclosed with the consent of the Members is confidential and proprietary information of the Company the disclosure of which would cause irreparable harm to the Company and the Members. Accordingly, each Member represents that it has not and agrees that it will not and will direct its shareholders, partners, members, directors, managers, officers, agents, advisors (including without limitation any appraiser selected by or on behalf of it, or by or on behalf of any appraiser selected by it) and Affiliates not to, disclose to any person any Information or confirm any statement made by third persons regarding Information unless the Members consent thereto or until the Company has publicly disclosed the Information and has notified each Member that it has done so.

(a)    The covenants contained in this <u>Section 9.14</u> will survive the Disposition of the interest in the Company of any Member and the termination of the Company.

(b)    Notwithstanding anything to the contrary contained in this <u>Section 9.14</u>, any Member may, without breach of the covenants set forth in this <u>Section 9.14</u> and without notice to or consent of the Members, disclose any Information in any filing required of such Member with any securities commission or other regulatory agency, or as may otherwise be required by Applicable Law.

(c)    Notwithstanding anything to the contrary contained in this <u>Section 9.14</u>, any Member may, without breach of the covenants set forth in this <u>Section 9.14</u>, disclose Information with the prior consent of the Manager (such consent not to be unreasonably withheld) if such disclosing Member discloses to the Manager (i) the purpose, nature, content and form of proposed disclosure, and (ii) the relationship to the parties to whom such disclosure is to be made. Any permitted disclosure that is made in a manner that is materially different from the proposed disclosure as consented to and approved by the Manger shall be deemed a breach of the covenants set forth in this <u>Section 9.14</u>.

**SECTION 9.14.    <u>Creditors Not Benefited</u>.** No creditor or other third party having dealings with any Member shall have the right to enforce the right or obligation of any Member to make capital contributions or loans or to pursue any other right or remedy hereunder or at law or in equity, it being understood and agreed that the provisions of this Agreement shall be solely for the benefit of, and may be enforced solely by, the parties hereto and their respective successors and assigns (and, in the case of Section 4.3 hereof, the other Indemnitees). None of the rights or obligations of the Members herein set forth to make capital contributions or loans to the Company shall be deemed an asset of the Company for any purpose by any creditor or other third Party, nor may such rights or obligations be sold, transferred or assigned by the Company or pledged or encumbered by the Company to secure any debt or other obligation of the Company or of any of the Members. In addition, it is the intent of the parties hereto that no distribution to any Member shall be deemed a return of money or other property in violation of the Act.

**SECTION 9.15.** <u>Sections</u>. Unless the context requires otherwise, all references in this Agreement to Sections or Articles shall be deemed to mean and refer to Sections or Articles of this Agreement.

**SECTION 9.16.** <u>No Waiver</u>. No waiver, express or implied, by any Member of any breach or default by any other Member in the performance by the other Member of its obligations hereunder shall be deemed or construed to be a waiver of any other breach or default under this Agreement. Failure on the part of any Member to complain of any act or omission of any other Member, or to declare such other Member in default irrespective of how long such failure continues, shall not constitute a waiver hereunder. No notice to or demand on a defaulting Member shall entitle such defaulting Member to any other or further notice or demand in similar or other circumstances.

**SECTION 9.17.** <u>Remedies Not Exclusive</u>. The remedies provided for herein are cumulative and not exclusive of any other rights, powers, privileges or remedies provided by law or under this Agreement. The exercise by any party hereto of any one or more remedies shall not constitute a waiver of, or otherwise prohibit, the exercise of other remedies provided herein or by law at the same or other times.

**SECTION 9.18.** <u>U.S. Dollars</u>. All references in this Agreement to dollar amounts shall refer to United States currency.

**SECTION 9.19.** <u>Approvals</u>. Except where otherwise indicated in this Agreement, all approval, consent and other similar rights of the Manager or of the Members pursuant to this Agreement may be exercised by such parties, and such approvals and consents may be granted or denied by such parties, in their sole and absolute discretion.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** this Limited Liability Company Agreement has been executed as of the _____ day of _____, 2013.

**CAYUGA LAKE ACQUISITION, LLC**
By: FINGER LAKES CAPITAL PARTNERS LLC,
    its Manager

By: _____
    Name:   Zubin Mehta
    Title:    Manager

**CLASS B MEMBER**

FINGER LAKES CAPITAL PARTNERS LLC

By: _____
    Name:   Zubin Mehta
    Title:    Manager

**CLASS A MEMBERS**

(Signature Pages for Class A Members to follow)

*Operating Agreement*
*of Cayuga Lake Acquisition, LLC –2013*

## SIGNATURE PAGE
## (CLASS A MEMBER)

## CAYUGA LAKE ACQUISITION, LLC

Dated: _____

The undersigned, by execution of this signature page, hereby agrees to become a Class A (nonvoting) Member of CAYUGA LAKE ACQUISITION, LLC (the "Company") and agrees to be bound by and to comply with all of the terms, covenants and conditions of the Operating Agreement of the Company as the same may from time to time be amended.

**Individual Subscriber**

**Corporation, Partnership, Trust, Limited Liability Company or other Entity**

_____
SIGNATURE

_____
Print exact name of entity

_____
Print exact name

By: _____
SIGNATURE

Date of Execution: _____, 20___

Date of Execution: _____, 20___

_____
Street Address

_____
Street Address

_____
City, State, ZIP

_____
City, State, ZIP

SSN or Tax ID No.:

SSN or Tax ID No.:

Capital Contribution $ _____

BN\926610.3

## Exhibit A

## CAYUGA LAKE ACQUISITION, LLC OPERATING AGREEMENT

Members Name, addresses, capital contribution, classes membership interests and sharing ratio.

| Names and Addresses | Capital Contribution | Class A Sharing Ratio | Class B Sharing Ratio | Overall Sharing Ratio |
|---|---|---|---|---|
| Finger Lakes Capital Partners LLC<br>621 West 51st Street, Suite 3E<br>New York, NY 10019 | $1,000.00 | 0% | 100% | 0.33 % |
| ALG Fund, LLC<br>280 Railroad Ave<br>2nd Floor<br>Greenwich, CT 06830 | $299,000.00 | 100% | 0% | 99.67% |
| | | | | |
| **Total Capital Contributions:** | **$300,000.00** | **100.0%** | **100.0%** | **100.00%** |

*Operating Agreement*
*of Cayuga Lake Acquisition, LLC –2013*

## EXHIBIT B

### DISTRIBUTION WATERFALL
### (pursuant to Section 7.1)

As used in this Exhibit B, "<u>Manager</u>" means Finger Lakes Capital Partners LLC ("<u>Finger Lakes</u>"), without regard to whether Finger Lakes is serving as the "Manager" under the Agreement.

The Manager will take a 20.00% "<u>Carried Interest</u>" (as defined below) on any gain in the investment upon a return to the Company.

Distributions will be made out of available cash realized by the Company from disposition of its investments, plus any dividends or interest income received. Such Distributions shall be made in cash and in U.S. dollars or in marketable securities at the sole discretion of the Manager.

<u>Distributions of Profits and Losses</u>. Distributions of available cash of the Company shall initially be apportioned among all Members holding Class A and Class B Membership Interests, and the Manager as follows:

(a)   <u>Return of Capital</u>: <u>First</u>, one hundred percent (100%) to the Members, pro rata in proportion to their contributed capital (their Overall Sharing Ratios), until the cumulative amount of all distributions to each Member pursuant to this clause (a) is equal to the sum of the Capital Contributions made by such Member;

(b)   <u>Preferred Return</u>: <u>Second</u>, one hundred percent (100%) to the Members, pro rata in proportion to their Overall Sharing Ratios, until the cumulative amount of all distributions to each Member pursuant to this clause (b) is sufficient to provide each such Member with a rate of return equal to six percent (6%) per annum compounded annually on the Capital Contributions of such Member computed from the dates the Capital Contributions were made by such Members;

(c)   <u>Carried Interest Catch-up</u>: <u>Third</u>, one hundred percent (100%) to the Manager as an incentive distribution (the "Carried Interest") until the Manager has received cumulative distributions equal to 20% of all distributions made pursuant to clause (b) immediately above and this clause (c).

(d)   <u>Carried Interest</u>: <u>Fourth</u>, 80% to the Members, pro rata in proportion to their respective Overall Sharing Ratios and 20% to the Manager as additional Manager's "Carried Interest".

## EXHIBIT C

### Form of Joinder Agreement

The undersigned hereby agrees, effective as of the date hereof, to become a party to that certain Operating Agreement (the "Agreement") dated as of May ____, 2013, by and among Cayuga Lake Acquisition, LLC (the "Company") and the parties named therein and for all purposes of the Agreement, the undersigned shall be included within the term "Member" (as defined in the Agreement). The undersigned further confirms that the representations and warranties contained in the Agreement are true and correct as to the undersigned as of the date hereof. The address and facsimile number to which notices may be sent to the undersigned is as follows:

Facsimile No._____.

_____

[NAME OF UNDERSIGNED]

BN\926610.3