DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
*Proposed Attorneys for the Debtor*
One North Lexington Avenue
White Plains, New York 10601
(914) 681-0200
Jonathan S. Pasternak, Esq.
Dawn Kirby, Esq.

*Hearing Date: April 8, 2016*
*Hearing Time: 10:00 a.m.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In re:

FINGER LAKES CAPITAL PARTNERS, LLC,

               Debtor.

--------------------------------------------------------X

Chapter 11
Case No. 16-22112 (RDD)

## DEBTOR'S OBJECTION TO THE MOTION OF LYRICAL OPPORTUNITY PARTNERS, L.P AND JEFFREY KESWIN SEEKING DISMISSAL OR CONVERSION OF THE CHAPTER 11 CASE

TO:    **HONORABLE ROBERT D. DRAIN,**
       **UNITED STATES BANKRUPTCY JUDGE:**

      Finger Lakes Capital Partners, LLC ("Debtor"), by its attorneys DelBello, Donnellan,

Weingarten, Wise & Wiederkehr, LLP, hereby submits this opposition to the Motion of Lyrical

Opportunity Partners, L.P. ("Lyrical") and Jeffery Keswin ("Keswin", and collectively with

Lyrical the "Movants") seeking dismissal or conversion of the Debtor's Chapter 11 case (the

"Motion"). In support of this Objection, the Debtor respectfully represents as follows:

      1.     The Debtor filed its chapter 11 case in a good faith effort to protect its assets for

the benefit of all creditors while completing an appeal against Lyrical which will also be

determinative in a pending lawsuit by Keswin that has been removed to this Court.

      2.     The Debtor believes that Lyrical and Keswin realize that the Debtor's chances of

prevailing in the appeal are very strong, which is evidenced by their refusal to sign the Debtor's

proposed stipulation lifting the automatic stay to allow the appeal to continue so that the Debtor may further pursue its substantial claims against Lyrical. Instead, as a bad faith litigation tactic, they filed the instant Motion in an effort to thwart the Debtor's appeal rights, thereby delaying the appeal process and ratcheting up costs for the Debtor causing further and additional harm to the Estate.

3.      As set forth below, the Motion is riddled with inaccuracies and misrepresentations in an effort to mislead the court and smear the reputations of the Debtor, its principals and its professionals. Typical of the overzealous and derogatory nature of Movants, they refer to a "war"[1] and football metaphors that the parties are "lined up on one side" and "on the other side"[2]. They even put words into Vice Chancellor Laster's mouth that he did not say, like "the Vice Chancellor found the Debtor had been siphoning millions of dollars from its portfolio companies", which is a complete inflammatory fabrication.[3]

4.      Unfortunately, these unwarranted attacks are already having an adverse effect on the Debtor's reputation and ability to maximize the value of its remaining assets. The Debtor is simply looking for a swift resolution of its appeal rights which the Debtor believes will result in a substantial award in its favor, thereby permitting it to pay its allowed and legitimate creditors 100%. Lyrical's Motion is therefore nothing more than a bad faith litigation tactic intended to wrest control of the Debtor's claims to the material detriment of the Debtor's legitimate creditors.

---

[1] Motion, ¶1.
[2] Motion, ¶1.
[3] Motion, ¶2. Note, the Motion doesn't cite to where the Vice Chancellor purportedly made this statement because in fact he never did.

<u>**Response to Inaccurate Representations in the Motion**</u>

5.      "*The Debtor has no income and no business expenses.*"[4]  This is patently false.

<u>Income</u>:  How could this representation be made in good faith when the Statement of Financial

Affairs and tax returns clearly show $1,650,000 in income in 2014, $300,000 in income in 2015,

and $4,000 in income in January 2016?  Also, it is the essence of the Debtor's business that it

receives income only after investing time and money in certain portfolio company acquisitions,

builds up the value of those companies then attempts to sell or otherwise monetize them.  In

addition to the $6 million income due to the Debtor from Lyrical for the Revolabs sale, the

Debtor also testified at the §341 meeting that it is expecting a potential income from the

successful sale of a company currently controlled by Lyrical, but in which the Debtor has a

carried interest, Rethink Autism.  In fact, the potential income from Rethink Autism is

acknowledged in the Motion[5].  In light of these facts known to Lyrical, how could Lyrical

represent in good faith that the Debtor has no income?  <u>Expenses</u>:  As for expenses, again,

Lyrical misrepresents what the Debtor has disclosed in documents filed in this case and testified

to at the §341 meeting.  The Debtor's principal, Mr. Shalov, testified at the §341 meeting that he

and the Debtor's other principal, Mr. Mehta, previously received salaries from the Debtor, but in

light of the drain of funds from litigation, they cut that expense and are not currently taking

salaries.  This is a prudent decision of a responsible business owner; not evidence that the Debtor

has no expenses.  As is typical with many businesses, the car expense for the principals is

reimbursed by the Debtor.  This is especially understandable in light of the principals' prudent

decision to forego salary for now.  Mr. Shalov also testified that there is a business insurance

expense that will be coming due.  Other common expenses include a phone system, cell phones,

email service and delivery services. In light of these facts known to Lyrical, how could Lyrical represent in good faith that the Debtor has no expenses?

6. "*[t]o pay Shalov's and Mehta's personal expenses… specifically, thousands of dollars in monthly payments on luxury cars.*"[6] Movants would have this Court believe that Shalov and Mehta are driving around in Ferraris and Bentleys. The alleged "*luxury*" vehicles are a Jeep, a Jetta and two Chevys. Proof was provided to the US Trustee's office and no objection has been made. As for alleged "*thousands of dollars*" in monthly payments, the expense is in the *two thousand dollar* range. Perhaps technically "two thousand" does mean "thousands", but it is not exactly the enormous cost implied by Movants. This is just another ploy to smear the Debtor without regard to the truth or the importance of being honest with this Court.

7. "*The Debtor argued the dispute over a loan by Keswin to the Debtor could not be resolved in the Delaware action… This forced Keswin to initiate a New York State court action…*"[7] This is true, although unfairly couched in a derogatory way. Again, typical of Movants' overzealous litigation tactics, Keswin attempted to ambush the Debtor by asserting a bogus claim in Delaware that had no jurisdictional basis. The Delaware Court agreed that Keswin had acted improperly. That is why Keswin was "forced" to commence the action in New York. More importantly, his purported claim exemplifies yet another perverted twist of the law. Keswin is attempting to assert a claim *well* after the six year statute of limitations has expired. The New York State court already denied Keswin's motion for summary judgment in lieu of complaint based on the Debtor's valid defense. Again, Movants' inference that the Debtor somehow acted improperly is so twisted that it constitutes a misrepresentation.

---

[4]  Motion, ¶1.
[5]  Motion, ¶12.
[6]  Motion, ¶4.

8.      *"In addition to being a two party dispute..."*[8]   This is by no means a two party dispute.  The Debtor not only has many third party unsecured creditors[9], it has other lawsuits[10], all related to its robust operations over the past 12+ years.  Had Lyrical honored its obligation to pay the Debtor over $6 million from the extraordinary success of the Debtor's remarkable insight and hard work on the Revolabs investment, the Debtor would be able to pay its legitimate creditors in full.  Instead, after Movants essentially crushed the Debtor's operations with staggering litigation costs and shut off the Debtor's access to its duly earned profits, the Debtor had to seek protection of this Court in order to protect its assets while swiftly prosecuting its appeal with the intent of recovering the substantial sums due from the Movants.  It should come as no surprise that relatives of the Debtor's principals were willing to loan monies to protect the Debtor while the Movants cut off resources.  Movants have the big purse strings.  If they thought that they could simply make it too expensive for the Debtor to assert its rights to the $6 million dollars due to it, perhaps Movants are just frustrated their unfair scheme to keep the Debtor's money did not work out due to the generosity in the people who believe in the Debtor's principals and their talents, without which the incredibly successful Revolabs investment would not have lined Movants' pockets.  There is nothing wrong or nefarious in obtaining private funding to preserve the estate and permit the Debtor to enforce its rights for its benefit and that of all of its creditors.

---

[7]  Motion, ¶3.
[8]  Motion, ¶4.
[9]  See Schedule B:  American Express, Ashby & Geddes, Citrin Cooperman, Lara Mehraban, Lyrical, and Kagen Law Firm.
[10]  Whitten v. Finger Lakes Capital Partners LLC, Jeffrey Keswin, Lyrical Opportunity Partners L.P, et al. involves the heart of the Debtor and Movants' operations – an investment in a company that specialized in constriction of aircraft fueling facilities.  The lawsuit involves two notes that were given to the former owners in connection with the purchaser of the business.  While the Debtor certainly believes this lawsuit is baseless, the Whittens are very real disputed creditors.

9. "*…the Debtor's case, if not its entire business, is permeated with insider transactions, notably:* [11]

a. "*Preference period loans by the Debtor to Shalov and/or his wife*". Movants intentionally fail to disclose to the Court that of the $57,000 in loans to Shalov's wife during the year before the Petition Date, one hundred percent (100%) of the loans were re-paid to the Debtor. Moreover, the Debtor did not hide this fact; it is disclosed in the Statement of Financial Affairs. Movants' counsel asked Mr. Shalov about these loans at the §341 meeting, and it was clearly explained that the loans had been repaid. Given all of this, why would Movants allege this shows the Debtor is somehow acting improperly? Why would Movants, knowing the truth, try to lead this Court to believe wrongdoing occurred? Because that is consistent with Movant's conduct – twisting the truth with accusatory and inflammatory half-truths and clouded allegations to try to ruin the Debtor's reputation to wrest control of its claims against Lyrical.

b. "*security interest grants by the Debtor to its principals' parents during the insider preference period*". Given the Movant's refusal to pay the Debtor the $6 million due on the Revolabs sale and barrage of subsequent litigation intended to bury the Debtor, additional loans were needed from family members to sustain the Debtor and help pay its litigations costs. Barry Shalov loaned Finger Lakes $1,900,000 pursuant to a credit line plus an additional $700,000 pursuant to a May 22, 2015 Note. In addition Jagat Mehta loaned $550,000. Keswin asserts he had the right to file a UCC-1 during the preference period, <u>nine</u> years after he allegedly loaned

---

[11] Motion, ¶4.

funds to the Debtor.  Why would he contradict his position and assert the parents'

filing of UCC-1 Financing Statements based on much more recent "new value"

loans has any taint of wrongdoing?  He cannot have it both ways.

c. *"undocumented or poorly documented transactions with Shalov's father…"*

There is no basis provided for this misstatement.  The loans are fully documented.

Notably, Movants don't even dispute that Shalov's father indeed loaned the funds

– because Movants know he did.

d. *"Reversionary interests in and claims against companies owned and managed by*

*Shalov and Mehta which pay for the Debtor's lease"*.  Again, this is an intentional

twisting of the truth that was fully explained at the §341 meeting.  The Debtor

shares commercial space with two companies in which Mr. Shalov and Mr. Mehta

have an interest.  The lease is in the Debtor's name, but the Debtor has made

severe cutbacks in its operating expenses and moved into a small area of the

rented space.  The other two companies cover the rent.  There is nothing improper

about this, and in fact the Debtor should be applauded for its efforts to reduce

costs.

10. *"Instead, the Debtor seeks to use Keswin's cash collateral…"*[12]  Keswin is not a

legitimate secured creditor.   The New York state court already found that issues of fact preclude

a finding that Keswin's claim is valid.  In fact, Keswin's motion for summary judgment was

outright denied by the court.  As set forth in the Debtor's cash collateral motion, it is undisputed

that Keswin's alleged loan to the Debtor occurred on August 1, 2006.  Keswin commenced the

New York action almost <u>nine</u> years later, on June 24, 2015.  Even more astounding, Keswin, an

insider of the Debtor, asserts that the UCC-1 that he filed a month later on July 21, 2015 (within the one year preference period) is somehow valid and unavoidable. These are not good faith arguments, and again show the extent to which the Movants are willing to go to twist reality to try to smear and destroy the Debtor. Moreover, the Debtor has fully disclosed all of this information to the Court in its cash collateral motion and removed the underlying Keswin note action to the Bankruptcy Court. How Keswin could assert the Debtor is somehow acting improperly is misleading.

11. *"In early 2014, after three of the five portfolio companies failed..."*[13] The implication is clear, but even Movants who have demonstrated an astounding ability to twist the facts do not expressly state that the three failures were the fault of the Debtor. In fact, one of "failed" companies, Portadam, collapsed under Lyrical's management, not the Debtor's. Of the other two, one is the subject of the pending lawsuit commenced by the Whittens which continues to be unresolved and disputed in litigation, and the other, involving an entity known as Performance, the Debtor was defrauded in its acquisition of the company and brought suit against the seller who turned out to be uncollectable against.

12. *"Shalov and Mehta had wrongfully paid themselves over $6 million from the portfolio companies."*[14] Of all the sullied allegations, this is the one that bothers the Debtor's principals the most. First, it is difficult to refute Movants' citations to the Delaware Court's decision because nothing in the citations remotely supports the Movants statement. Movants cite to page 11-12 of the decision which discusses an email from Mehta to Keswin acknowledging that Mehta and Shalov were entitled to $150,000/year salary each. The Debtor properly paid the

---

[12] Motion, ¶4.
[13] Motion, ¶9.
[14] Motion ¶9.

salaries from management fees received from the portfolio companies which is entirely customary in its industry. Nothing in the Decision indicates that there was anything improper whatsoever with Shalov and Mehta taking their duly earned salaries of $150,000 each. Movants also cite to page 21 of the decision which again references Shalov's and Mehta's right to take a salary of $150,000 each. Again, there is no reference to any wrongful payment. Perhaps what Movants are referencing is $ 6 million in management fees earned by the Debtor (not Shalov and Mehta) over the entire ten (10) year period that it managed operations of the portfolio companies. The Delaware Court never found it was improper for the Debtor to be paid those management fees. Rather, the Delaware Court found that Lyrical has a timely claim to share in approximately $880,000 of that amount. (Decision pp. 43 – 46). So, once more the Movants have taken a sliver of the truth ($6 million in management fees were duly paid to the Debtor over ten years) and twisted it into an unwarranted smear against the Debtor (Shalov and Mehta wrongfully paid themselves $6 million). Regardless, the Debtor believes the Delaware Court is wrong on the issue of Lyrical's entitlement to $880,000, and that issue will be addressed in the appeal.

13.     *"...the Court concluded that not only was the Debtor owed no further funds from Honeoye [the Revolabs investment entity], but that the Debtor owed Lyrical an additional $1 million..."* [15] This is misleading. In a decision from the bench on January 28, 2015, the Delaware Court granted the Debtor's Motion for Judgment on the Pleadings against Lyrical. Essentially, the Court held that the Debtor was entitled to receive from Lyrical $6 million from the Revolabs sale. The Court declined to enter judgment subject to its further determination whether the Debtor owed any funds to Lyrical. It was the later Memorandum Decision and Final Order and Judgment, which the Debtor has appealed, that the Court incorrectly permitted Honeye

to distribute the Revolabs sale proceeds solely to Lyrical.  Movant's statement is misleading because the Court in fact found that the Debtor was owed $6 million from the Revolabs sale.  If the Debtor is successful in reversing the later decision that permits Lyrical an offset, it has already been determined the Debtor is owed substantial funds from Lyrical.

14.     "*Because the Debtor lacked the funds to repay the Keswin Note by the applicable maturity date, the parties agreed (through a series of written emails between 2008 and 2010) that Keswin Note remained outstanding and payable and would be paid once the Debtor achieved a positive return on its investment portfolio.*"[16]   This statement is asserted as truth, but is merely Keswin's disputed assertion.  This argument was already shot down by the New York State court which denied Keswin's motion for summary judgment.   The alleged extension of the statute of limitations is the primary dispute that is as-of-yet unresolved in the pending removed lawsuit.  Movants' statement that the Debtor somehow committed wrongdoing is at a minimum misleading and omits the fact that the New York State court thus far has refused to accept Keswin's position.

15.     "*The Debtor immediately attempted to impair Keswin's position by granting security interests to its principals' parents on account of monies previously advanced to the Debtor (or to the principals) a decade earlier.*"[17]   Keswin filed a bogus UCC-1 Financing Statement based on a loan that is time-barred by the statute of limitations nine years after the alleged loan.  Knowing that Keswin may take such action to damage the Debtor, the legitimate creditors who loaned the Debtor far more money than Keswin ($1.9 million and $550,000 by the parents of Shalov and Mehta versus $400,000 from Keswin) and made additional "new value"

---

[15]  Motion ¶12.
[16]  Motion, ¶14.
[17]  Motion ¶ 16.

loans at the time of the UCC filings filed their own UCC-1 Financing Statements. There was nothing wrong with those parties securing the debit legitimately owed to them. Certainly, if there was nothing wrong with Keswin doing it, how could he argue there is something wrong with the parents doing it? Furthermore, there is absolutely no basis provided by Movants for their allegations that the parents' loans were made a decade earlier or that the loans were to Shalov and Mehta, not the Debtor. Again, Movants present derogatory inferences based on inaccuracies for the purpose of denigrating the Debtor's reputation without regard to proof.

16. "*...the Debtor commenced this case for the sole purpose of continuing its litigation with Lyrical.*"[18] The Chapter 11 case is not all about Lyrical. There are many other substantial, legitimate creditors who stand to lose a great deal of money if Lyrical is allowed to improperly keep the $6 million due to the Debtor and potentially deny the Debtor its carried interest from the Rethink Autism investment. Admittedly, overblown litigation costs (caused by Lyrical) were the immediate cause of this Chapter 11 filing. However, the purpose of the filing is to protect the Debtor, its assets and its continued operations for the benefit of its creditors while it has an opportunity to pursue the reversal on appeal of the Delaware Decision. The Debtor therefore filed this case in good faith for legitimate purposes. Lyrical, to the contrary, filed this Motion for improper litigation purposes of thwarting the Debtor's appeal rights, because Lyrical realizes the Debtor has a strong chance to win the appeal and reclaim $6 million Lyrical owes the Debtor.

17. "*341 Tr. at 49:23 – 50:13 (acknowledgement by Shalov the Debtor has not investigated prepetition transfers to relatives).*"[19] Movants would have this Court believe that the Debtor is intentionally neglecting its duty to investigate and disclose transfers to insiders

made within the one year prior to the Petition Date, regardless of the fact that the information is disclosed in detail in the Statement of Financial Affairs. Movants completely misrepresent what the Debtor has disclosed in documents filed with this Court and what Mr. Shalov testified to at the §341 hearing to the best of his ability in light of Movants' counsel's inartful questioning. Following are examples of Movants' counsel asking the same question over and over, seemingly intentionally trying to confuse Mr. Shalov:

<u>341 Tr. at 44:3 – 5; 45:2-14, 23-25; 461-3, :21-25; 47:2-5</u>

**Q:  Does the Debtor have any intention of investigating preference actions against…?**

A:  No, that was the loan that was repaid.

Q:  Okay, let me finish.  Let me take that [*referencing SOFA which contains list of transfers to insiders*] and then we'll… So the $35,000 here, this is the loan that you testified to Mr. Morrissey that was repaid?

A:  Yes.

Q:  So, was that a loan to your wife? Was that a loan from your wife?  I'm sorry…

A.   So it's a loan to Danielle, which was paid back by Danielle prior to file.

Q:  Danielle paid this $25,000 to Finger Lakes?

A.   I don't understand…

[discussion]

A.   So, Finger Lakes Capital Partners made a loan to Danielle Shalov.  I don't know if the total loan amount was 35,000 or if the total loan amount was more because some was borrowed in October.  I can't remember.

Q: Danielle paid Finger Lakes Capital Partners in full?

A:  Correct…

<hr>

[18]  Motion, ¶20.
[19]  Motion, ¶22, footnote 9.

341 Tr. at 48:13 – 18

Q: **Does the Debtor intend to investigate preference actions against relatives of yourself and Mr. Mehta?**

A: The Debtor has two years to prosecute preference actions and will comply with its fiduciary duties to the estate.

341 Tr. at 48:19 – 25;

Q: **Has the Debtor investigated other transfers to family members of you and Mr. Mehta within the one year prior to the bankruptcy?**

A: Are you asking whether the information provided on the Statement of Financial Affairs is incorrect?

341 Tr. at 49:1 – 5

Q: **I'm just asking whether they've investigated transfers to family members within one year.**

A: I don't know how to answer that. What does "investigated" mean?

[discussion]

Q: Sure. You know what? I'll just leave it with has the Debtor investigated it or not? If it hasn't, it hasn't.

A: I don't understand the question, although referencing Question four of the Statement of Financial Affairs, I can read what it says, which is "Transfers are anticipated to Mr. Shalov and Mr. Mehta for expense reimbursement in amounts to be provided." It's still being calculated but I didn't want to delay filing the schedules.

Q: **I'm just asking whether there's been any investigation of transfers made to family members of Mr. Shalov and Mr. Mehta.** That's all.

This line of questioning is just short of harassment. Insider transfers were fully disclosed in the Statement of Financial Affairs. The question was answered over and over to the best of Mr. Shalov's ability. It is clear that Movants <u>wish</u> the Debtor would answer "no, we have no intention of honoring our duty to creditors and refuse to disclose insider transactions", but that

simply is not the case. It is ridiculous that after reading the Debtor's SOFA and repeatedly asking the same question over and over at the §341 meeting, Movants would represent to this Court that the Debtor has *acknowledged* it has not made any investigation. This is just another baseless misrepresentation and attempt to ruin the Debtor's reputation.

18. *"The Debtor's only scheduled assets are indirect ownership interests in portfolio companies..."*[20] Movant is trying to minimize the Debtor's value. What Movant fails to acknowledge that (i) the Debtor has continuing operations; and (ii) the Debtor's interest in the portfolio companies includes a $6 million claim against Lyrical for carried interest in Revolabs, and potential significant claims to carried interest in Rethink Autism and Nourish Snacks.

19. *"The budget indicates the Debtor has no employees and does not pay rent".* [21] The Debtor is acting responsibly by currently operating on a bare bones budget. Mr. Shalov and Mr. Mehta run the Debtor, but are currently not taking a salary. The lack of payroll expense should not be held against the Debtor. Likewise, Mr. Shalov testified that the Debtor's office space is shared with two companies in which Mr. Shalov has an interest. As of recent, the other two companies were fully covering the rent, although the Lease is in the Debtor's name and a copy has been provided to the U.S. Trustee, and the Debtor anticipates paying its proportionate share of the rent in the amount of $1,400 per month going forward. Again, the Debtor's rent arrangement is a reason to applaud the Debtor, not make a negative inference as to its methods of operating. The Debtor's efforts to save money instead of spending money are reasons for it to stay in chapter 11, not reasons to sabotage its reorganization efforts.

20. *"The Debtor claims it does not manage JumpHawk or Nourish. This assertion is*

---

[20] Motion, ¶24.
[21] Motion, ¶26.

*difficult to credit as Shalov and Mehta founded, run and invested in these companies..."* [22] ].

Rather than accepting Mr. Shalov's truthful statement made under oath, Movants infer he is a liar without any basis whatsoever – another careless misrepresentation made by Movants solely to discredit and damage Mr. Shalov. As set forth in the Stipulation and Order Authorizing Amendment of Limited Liability Company Operating Agreement Concerning Debtor's Interest in Cayuga Lake Acquisition LLC [Docket No. 28], approval of which is pending before this Court, ALG Fund LLC manages Nourish. Why would Movants infer otherwise? Because they are so fixated on smearing Mr. Shalov's reputation they don't feel the need to have any basis for their allegations. They are trying to sabotage the Debtor in the hope that it's right to appeal will be lost and they will be able to "pocket" the Debtor's $6 million dollars, plus any money they will owe the Debtor for Rethink Autism.

      21.     *"Alleged loans to Shalov or his wife*."[23] There was a loan from the Debtor to Mr. Shalov's wife within the one year before the Petition Date that was repaid in full and reported on the Statement of Financial Affairs. This is certainly no reason to convert the chapter 11 case.

      22.     *"Alleged loans from Shalov's parents*" and *"Mehta's father's lien*".[24] Movants either fail to grasp, or fail to disclose to this Court how Mr. Shalov attempted to answer counsel's inartful questioning regarding payments into and out of the Debtor's accounts. Movants seem to infer that loan proceeds deposited into an account with significant other monies already existing in the account can be traced precisely to a payment made out of that account. The fact that Mr. Shalov's parents attempted to help out the Debtor with loans in part to keep operations going and to help fund the legal costs of recovering the $6 million dollars from Lyrical, cannot be twisted to

---

[22] Motion, ¶28.
[23] Motion, ¶29.
[24] Motion, ¶30, 31.

infer there is some type of nefarious intent.  Closely held companies often receive loans from relatives during distressed times.  There is nothing unique or disreputable about Mr. Shalov's parents helping the Debtor with loans.

23.     "*Shalov could not identify FCPC, LLC*".  FCPC is a landlord in Port Chester, New York to whom the Debtor paid rent prior to the Chapter 11 case.  It was properly disclosed on the Statement of Financial Affairs. On the day of the 341 meeting, in the midst of all of the confusing questioning by Movants' counsel, Mr. Shalov could not immediately remember what FCPC LLC was.

341 Tr. at 43:22 – 25; 44:1-23

Q: Do you know what FCPC is?

A:  Could you direct me to where…?

Q:  Sure.  That's on Page 17 of the Statement of Financial Affairs.  I'm happy to share… counsel has one.

A:  (debtor's counsel) These were the payments within the 90 days.  We're looking at the Statement of Financial Affairs, Question 3.

Q:  Yes, its' 3.4.

A:  Is this payments received or payments…?

A: (debtor's counel) These are payments that the Debtor made in excess of $6,000 and change in the aggregate.

A:  I don't want to misspeak so I don't remember.

Q:  You don't know what this company is?

A:  I can't remember what it is.

Q:  Okay.  But that's not a company you have an interest in?

A:  No, no, definitely not.  I'm 100 percent sure of that.  I don't have an interest in them.

Movants would like the Court to infer that Mr. Shalov's temporary lack of clarity about the payee

indicates he is trying to hide something.  To the contrary, what the transcript shows is that Mr. Shalov answered the questions to the best of his ability at the time of the 341 meeting.  He obviously provided the information from the Debtor's records for inclusion in the Statement of Financial Affairs.  This is just another attempt to disparage Mr. Shalov for the purpose of undermining him before this Court.

24.    *"Finger Lakes Debt Partners.  The Debtor fails to schedule its interest in FLDP as estate property... In a sworn affidavit, Shalov claimed that he is FLDP's managing partner and that he and Mehta are its only members."*[25]   FLDP was inadvertently excluded from the Debtor's Schedules.  The Schedules will be properly amended.  Movants are <u>well</u> aware of the Debtor's interest in FLDP.  In 2015, Lyrical sued FLDP based on a Note.  In March 2016, a decision was entered in Lyrical's favor against FLDP in excess of $4 million (judgment pending).  In that case Lyrical's counsel represented to the Court that the Debtor is the managing member of FLDP.  Thus, there was absolutely no prejudice to Movants as a result of the inadvertent omission.  It is also immaterial because the value of the Debtor's interest is zero.

25.    *"Dissipation of Revolabs Sale Proceeds."*[26]   Movants say an investigation is needed into all expenses and payments made by the Debtor since 2014, and conclude that it "appears likely" that the Debtor dissipated the funds.  This statement is made with absolutely no concrete grounds or any other basis other than Movants' derogatory inference.  The Debtor is an operating company with not only common business expenses but also substantial legal expenses caused by primarily the Movants.   If Movants truly believe there has been a dissipation of assets since 2014, Movants should conduct a 2004 Exam.  Until such time as any actual basis exists for Movant's statements, they should be wholly disregarded by this Court.

## ARGUMENT

26.    The Motion to Dismiss must be denied because the Debtor filed for chapter 11 relief with the good faith intention to use the Bankruptcy Court to reorganize its affairs, including swift prosecution of the appeal, while protecting its assets for the benefit of its legitimate creditors.

27.    As demonstrated above, the arguments made by Movants equate to the proverbial "throwing everything against the wall to see what sticks." The sheer volume of baseless derogatory allegations justifies discounting everything Movants say. They are clearly motivated to sabotage the Debtor's legitimate reorganization efforts and to throw up as many road blocks to the appeal as possible. This is commonly known as a bad faith litigation tactic. This is further evidenced by their refusal to merely stipulate to lifting the automatic stay to permit the appeal to move forward! The more delay they cause, the longer they are able to hold on to the Debtor's $6 million dollars.

28.    A motion seeking to dismiss a chapter 11 proceeding is determined under §1112(b) of Title 11 of the United States Code (the "Bankruptcy Code"), which states in pertinent part,

> (b) (1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 [11 USCS §§ 701 et seq.] or dismiss a case under this chapter [11 USCS §§ 1101 et seq.], whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) [11 USCS § 1104(a)] of a trustee or an examiner is in the best interests of creditors and the estate.
>
> 11 SCS § 1112

---

[25] Motion, ¶33.
[26] Motion, ¶36.

29.     Bankruptcy Code §1112(b)(4) sets forth a nonexhaustive list of "cause"

supporting dismissal of a case. Absent from the §1112(b)(4) is "bad faith". There is no specific

statutory language stating that a case may be dismissed for bad faith. Notwithstanding, the

determination of a motion to dismiss for bad faith requires a subjective and objective showing of

bad faith, as set forth in *Carolin Corp v. Miller*, 886 F.2d 693 (4th Cir. 1989) and adopted in the

Second Circuit in *In re General Growth Properties Inc.*, 409 B.R. 43 (Bankr. S.D.N.Y. 2009).

30.     The dual standard set forth in *Carolin* requires a movant to establish both that the

debtor had improper motive in filing and the case evidences objective futility in terms of being

able to reorganize,

> "[A] bankruptcy court may dismiss such a petition for want of good faith
> in its filing, but only with great caution and upon supportable findings
> both of the objective futility of any possible reorganization and the
> subjective bad faith of the petitioner in invoking this form of bankruptcy
> protection."

> *Carolin Corp. v. Miller*, 886 F.2d 693, 694 (4th Cir. 1989)

31.     The Court in *Carolin* further held that,

> if the only question raised is whether a reorganization is realistically
> possible, *i.e.,* if there is no questioned the petitioner's subjective good faith
> in filing, threshold dismissal of a petition is not warranted. In those
> circumstances the question of ultimate futility is better left to post-petition
> developments…it is better to risk proceeding with a wrongly motivated
> invocation of chapter11 protections whose futility is not immediately
> manifest that to risk cutting off even a remote chance that a reorganization
> effort so motivated might nevertheless yield a successful rehabilitation.

> *Id.* at 700-701.

32.     In evaluating the indicia of bad faith, the Court in *Carolin* required examining the

totality of circumstances, with no single factor necessarily leading to a finding of bad faith. *Id.* at

701. The Court further found no intrinsic bad faith in the filing of the chapter 11 petition in the eleventh-hour, stating

> These final hour events would not, standing alone, warrant an inference of bad faith -- though they might support in a critical way otherwise justifiable suspicions. By providing for interim emergency relief, including an automatic stay of creditor self-help efforts, the bankruptcy code manifestly sanctions -- indeed encourages -- not only the eleventh-hour invocation of its protection, but the last minute appearance of new management armed with fresh capital… In such circumstances, a last ditch attempt to forestall imminent financial collapse would obviously *further* the purposes of Chapter 11 if it ultimately facilitated the emergence of new investors offering an "infusion of capital" and previously unavailable "management expertise."

> *Id.* at 703-04. (emphasis in original)

33.     The 4th Circuit Court in *Carolin* ultimately affirmed the Bankruptcy Court's dismissal of the chapter 11 case finding evidence of both objective and subjective bad faith. In *Carolin*, the Debtor was a real state holding company that owned an industrial building. The building was damaged by a fire and the insurance proceeds were upstreamed to the owners. However, the repairs to the building were not completed, the affiliate tenant has been paying the rent, and the Debtor made no efforts to secure financing. The unwillingness of the Debtor to reorganize its affairs by proactively managing its reorganization established cause for dismissal of the case.

34.     The facts of this case are easily and critically distinguishable from those in *Carolin.* Here, the Debtor continues to operate and is attempting to swiftly prosecute its appeal. Before this Motion was filed, the Debtor had already (i) filed an application to retain Ashby & Geddes P.A. as local appellate counsel; (ii) filed a motion seeking to lift the automatic stay to pursue the appeal - because Movants would not so stipulate; and (iii) filed Schedules and

Statement of Financial Affairs; and (iv) filed an application for a Bar Date. The Debtor is expeditiously moving its chapter 11 case along.

35.     Nor has there been any allegation of mismanagement of the Debtor's assets post-petition. Movant's vague unsubstantiated allegation that the Debtor spent substantial sums operating its business between 2014 and 2016 is founded upon nothing. It is just another in a long line of misstatements and derogatory allegations meant to damage the Debtor's reputation.

36.     Conversion of the case to Chapter 7 is likewise inappropriate. The Debtor seeks to retain its appellate counsel on a contingency fee basis. The Debtor is highly motivated to swiftly prosecute the appeal. The Delaware Court has already found the Debtor is owed $6 million dollars in carried interest from Lyrical. If the Debtor is successful on its appeal of the subsequent ruling on alleged set offs granted to Lyrical, the Debtor will have access to substantial funds sufficient to pay its legitimate creditors in full.

<u>CONCLUSION</u>

37.     The Debtor filed this chapter 11 case with genuine and sincere intentions to protect its valuable assets, including rights to carried interest from Lyrical from the Revolabs investment and potential additional income from the Rethink Autism investment.

38.     Movants' allegations have been shown to be mistaken at best, a twisting of the truth, and in some instances outright misrepresentations to this Court. Asking a lot of unfounded questions that infer there may be possible negative answers is not grounds to either dismiss or convert a chapter 11 case. The Motion was neither filed nor founded in good faith and should be denied in all respects.

**WHEREFORE,** the Debtor respectfully requests that the Court deny the Motion in its entirety and grant the Debtor such other and further relief as is just and proper under the circumstances.

Dated: White Plains, New York
       March 30, 2016

DELBELLO DONNELLAN
WEINGARTEN WISE & WIEDERKEHR, LLP
*Attorneys for the Debtors*
One North Lexington Avenue
White Plains, New York 10601
(914) 681-0200

By:*/s/ Jonathan S. Pasternak*
       Jonathan S. Pasternak